1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                    EASTERN DISTRICT OF CALIFORNIA

10

11   RAUL PIZANA, et al.,                    No.  1:18-cv-00644-ADA-SKO

12              Plaintiffs,                   ORDER DENYING SANMEDICA'S
                                             MOTIONS TO STRIKE AND DISQUALIFY
13        v.                                 AND MR. FRIEDLANDER'S MOTION TO
                                             STRIKE
14   SANMEDICA INT'L, LLC, et al.,
                                             (ECF Nos. 189, 190, 218)
15              Defendants.
                                             ORDER GRANTING MR. FRIEDLANDER'S
16                                           RULE 12(B)(2) MOTION TO DISMISS

17                                           (ECF No. 217)

18                                           ORDER GRANTING, IN PART, ENTITY
                                             DEFENDANTS' RULE 12(B)(2) MOTION TO
19                                           DISMISS

20                                           (ECF No. 220)

21                                           ORDER GRANTING, IN PART, GAY
                                             DEFENDANTS' RULE 12(B)(2) MOTION TO
22                                           DISMISS

23                                           (ECF No. 231)

24                                           ORDER GRANTING LIMITLESS'S MOTION
                                             FOR JOINDER AND RULE 12(B)(2)
25                                           MOTION TO DISMISS

26                                           (ECF No. 234)

27                                           ORDER TRANSFERRING VENUE TO THE
                                             DISTRICT OF UTAH
28

                                            1

I.     **FACTUAL AND PROCEDURAL BACKGROUND**

     A.     <u>Procedural Background</u>

This Order addresses Plaintiffs' Third Amended Complaint ("TAC") in this putative class action.[1]  In the Complaint's first three iterations, Plaintiff Raul Pizana alleged four state law false advertising claims against Defendant SanMedica International, LLC ("SanMedica").  (*See, e.g.*, ECF No. 1.)  The litigation surrounding the complaints resulted in the Court denying two motions to change venue, one motion to dismiss,[2] and a motion to stay from SanMedica.  (ECF Nos. 50, 69.)  After discovery, SanMedica filed a motion for summary judgment, (ECF No. 117), which it later withdrew after the Court granted Pizana leave to file the TAC.  (ECF No. 170.)

The TAC significantly expands the scope of this case, adding seven named Plaintiffs, fifteen Defendants, and one claim pursuant to the Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. § 1962.  (ECF No. 175.)  In addition to SanMedica, this case now includes the following Defendants: BR Cos, LLC ("BR Cos"), Basic Research Holdings, LLC ("BR Holdings"), Basic Research Intermediate, LLC ("BR Intermediate"), Basic Research, LLC ("BR"), Sierra Research Group, LLC ("Sierra"), Majestic Media, LLC ("Majestic"), CRM Specialists, LLC ("CRM"), Bydex Management, LLC ("Bydex"), Novex Biotech, LLC ("Novex"), Limitless Worldwide, LLC ("Limitless"), Bodee Gay, Gina Daines, Haley Blackett, Kimm Haws,[3] and Mitchell Friedlander.  To avoid confusion to the extent possible, the Court will refer to BR Cos, BR Holdings, BR Intermediate, Sierra, Majestic, SanMedica, CRM, Bydex, and Novex as the "Entity Defendants."  The same law firm represents

---

[1]    In the interests of justice and addressing the heavy civil caseloads in the Fresno courthouse, the undersigned resolves only the pending motions cited herein.  Upon resolution of these motions, unless or until otherwise ordered by the court, the case will remain as currently assigned and will retain case number 1:18-cv-00644-ADA-SKO.

[2]    The Court granted, in part and with leave to amend, SanMedica's motion to dismiss Pizana's claim under the Consumer Legal Remedies Act for failure to provide timely notice of alleged violations.  (ECF No. 50.)  Pizana subsequently provided proper notice before filing the second amended complaint.  (*See* ECF No. 53 at ¶ 59.)

[3]    Ms. Haws notes that she changed her last name from Humphreys in April 2022.  (Haws Decl., ECF No. 231-1, at ¶ 3.)  The TAC refers to her erroneously as Kimm Humphries.  (*See, e.g.*, ECF No. 175 at 1.)  The Court will refer to her as Ms. Haws throughout this Order.

1    all of them.  Because a separate firm represents Limitless and has submitted distinct filings, the

2    Court will refer to Limitless individually.  The Court will refer to Mr. Gay, Ms. Daines, Ms.

3    Blackett, Ms. Haws, and Mr. Friedlander collectively as the "Individual Defendants."  Because

4    the same firm represents Mr. Gay, Ms. Daines, Ms. Blackett, and Ms. Haws, the Court will also at

5    times refer to them collectively as the "Gay Defendants."

6         Plaintiffs allege the following causes of action: a claim against all Defendants for

7    violations of 18 U.S.C. § 1962(a), (c)–(d), the RICO Act; a claim against all Defendants for a

8    violation of California Civil Code sections 1750, et seq., the California Consumers Legal

9    Remedies Act ("CLRA"); a claim against all Defendants for a violation of California Business &

10   Professions Code §§ 17500, et seq., California's False Advertising Law ("FAL"); and a claim

11   against all Defendants for a violation of California Business & Professions Code §§ 17200, et

12   seq., California's Unfair Competition Law ("UCL").  (*Id.* at ¶¶ 173–286.)

13        This Order addresses the flurry of motions that the newly added Defendants filed in

14   response to the TAC.  Entity Defendants filed a motion to dismiss for lack of personal

15   jurisdiction, or, in the alternative to change venue, and a motion to dismiss for failure to state a

16   claim.  (ECF Nos. 220, 224-1.)  SanMedica filed a separate motion to strike the TAC and an

17   attendant motion to disqualify Plaintiffs' counsel.  (ECF No. 189, 190.)  The Gay Defendants

18   filed a motion to dismiss for lack of personal jurisdiction, or, in the alternative, to change venue,

19   and for failure to state a claim.  (ECF No. 231.)  Mr. Friedlander filed a motion to strike and a

20   motion to dismiss for lack of personal jurisdiction and for failure to state a claim.  (ECF Nos. 217,

21   218.)  Finally, Limitless filed an answer followed by a motion for judgment on the pleadings.

22   (ECF Nos. 236, 237.)  It also filed a notice of joinder in the motions to dismiss that Entity

23   Defendants and Mr. Friedlander filed.  (ECF No. 234 (citing ECF Nos. 217, 220, 224-1).)

24        Plaintiffs filed two omnibus oppositions.  One addressed Defendants' merits arguments.

25   (ECF No. 248.)  The other responded to challenges to personal jurisdiction and venue.  (ECF No.

26   249, 270-1.)[4]  Defendants replied.  (ECF Nos. 260–66.)

27   _____

28   [4]      On August 28, 2023, the Court granted, in part, SanMedica's request to seal certain
     portions of Plaintiffs' jurisdiction-related opposition and accompanying exhibits.  (ECF No. 269.)

1              B.     Factual Background

2            Plaintiffs allege Defendants have created a complex web of affiliated entities and

3    individuals that develop, market, and sell multiple chemically identical and equally ineffective

4    human growth hormone ("HGH") supplements.  (*See* ECF No. 175 at ¶¶ 1, 6, 12, 13.)  They refer

5    to this group as the Basic Research Enterprise.  (*Id.* at ¶ 35.)  BR Holdings, BR Cos, and BR

6    Intermediate, which operate as holding companies for the other Entity Defendants, [5] are limited

7    liability companies headquartered in Delaware with their principal places of business in Utah.

8    (*Id.* at 50–52.)  Under their umbrella, BR operates as a distributor, Sierra conducts research and

9    development, Majestic provides marketing and advertising services, CRM conducts sales and

10   customer service, and Bydex provides staffing services.  (*Id.* at ¶¶ 37–41.)  These entities support

11   the production of an HGH supplement that Defendants market through three different companies

12   and under four different brand names: SanMedica sells the supplement under the brand name

13   SeroVital; Limitless sells it under the brand names Thrive and Serodyne; and Novex sells it under

14   the brand name Growth Factor 9.  (*Id.* at ¶¶ 42–44.)  All the Entity Defendants that operate under

15   the umbrella of the holding companies are limited liability companies headquartered, with

16   principal places of business, in Utah.  (*Id.* at ¶¶ 37–44.)  None of these entities, Plaintiffs allege,

17   are legally distinguishable, but rather exist for the purposes of dispersing liability and creating a

18   false image of legitimacy for the supplement that they market.  (*Id.* at ¶¶ 6–8.)

19           The TAC alleges that the Individual Defendants all reside in Utah and participate in the

20   Basic Research Enterprise as executive officers.  (*Id.* at ¶¶ 45–49.)  Mr. Gay is an owner and the

21   Chief Executive Officer of the Basic Research Enterprise and previously served as its Vice

22   ───────────────

23   Pursuant to that order, Plaintiffs re-filed their jurisdiction-related opposition and accompanying exhibits.  (ECF No. 270.)  When referring to Plaintiffs' jurisdiction-related opposition, this order will cite to the re-filed documents.

24

25   [5]    In the TAC, Plaintiffs note that the actual holding company for the Entity Defendants has changed over time.  As of September 15, 2020, BR Intermediate and BR Holdings are no longer

26   corporate entities under Utah Law, and BR Cos became the sole umbrella company for each Entity Defendant.  (ECF No. 175 at ¶ 50 n.2.)  On April 28, 2022, SanMedica filed a Corporate

27   Disclosure Statement with the Court noting that its grandparent company is an entity with the name Phoenix Awakening Holdings.  (*Id.*)  Plaintiffs note that Phoenix Awakening Holdings

28   appears not to have existed as an entity prior to this litigation.  (*Id.*)

President of Sales.  (*Id.* at ¶ 45.)  Ms. Daines is also an owner of the Basic Research Enterprise and previously served as its Chief Marketing Officer.  (*Id.* at ¶ 46.)  Both Ms. Blackett and Ms. Haws are executive officers of the Basic Research Enterprise with final decision-making authority over the organization's operations.  (*Id.* at ¶¶ 48–49.)  Finally, Mr. Friedlander is the inventor of the supplement formula that the Basic Research Enterprise manufactures and sells.  (*Id.* at ¶ 47.)  He has also been an executive officer of the Basic Research Enterprise.  (*Id.*)

Plaintiffs allege that the Defendants sell their HGH supplements by using misleading and fraudulent marketing techniques.  The packaging of each supplement contains claims about how the products can increase HGH within the human body by 682%, resulting in various physical benefits.  (*Id.* at ¶ 10.)  Contrary to these assertions, Plaintiffs allege,

> In fact, the Products provide consumers with nothing more than a false promise.  The scientific community confirms: (1) the Products cannot increase HGH levels whatsoever, let alone by 682%; (2) the Products do not reduce wrinkles, "decrease[] body fat," "increase[] lean muscle mass," strengthen bones, "improve[] mood," "heighten[] sex drive," or make "users look and fee[l] decades . . . younger" because the oral administration of amino acids like the Products do not increase growth hormone bioactivity; (3) there is no causal link between increased HGH levels and most of the claimed uses, including wrinkle reduction, increased lean muscle mass, stronger bones, improved mood, [or] heightened sex drive; and (4) if the Products were to increase HGH levels as claimed, it would cause significant health risks.

(*Id.* at ¶ 12.)  Defendants ground much of their marketing in a clinical trial that their Chief Scientific Officer, Dr. Amy Heaton, conducted.  (*Id.* at ¶¶ 9, 11.)  Plaintiffs, relying on an expert they retained for this litigation, allege that Defendants have intentionally misrepresented the results of this trial.  (*Id.* at 13–14.)  A closer look at the results of the trial demonstrates that the effects of Defendants' HGH supplements is no different than that of a placebo.  (*Id.* at ¶ 11.)

**II.   MOTIONS TO STRIKE**

**A.   Legal Standard**

The Court's power to strike material in the record derives from two sources.  First, Federal Rule of Civil Procedure 12(f) permits a court to strike "redundant, immaterial, impertinent, or scandalous matter" from a pleading.  The purpose of Rule 12(f) "is to avoid the expenditure of time and money that must arise from litigating spurious issues by dispensing with those issues

1    prior to trial." *Sidney-Vinstein v. A.H. Robins Co.*, 697 F.2d 880, 885 (9th Cir. 1983).  "Courts

2    often regard motions to strike with disfavor, since such motions are frequently used as stalling

3    tactics and since pleadings are of limited importance in federal practice."  *Platte Anchor Bolt, Inc.*

4    *v. IHI, Inc.*, 352 F. Supp. 2d 1048, 1057 (N.D. Cal. 2004).  Therefore, a court should not grant a

5    motion to strike "unless it is clear that the matter to be stricken could have no possible bearing on

6    the subject matter of the litigation."  *Figueroa v. Kern Cnty.*, 506 F. Supp. 3d 1051, 1056 (E.D.

7    Cal. 2020).  When evaluating a motion to strike, courts "must view the pleading in a light most

8    favorable to the non-moving party and resolve any doubt as to the relevance of the challenged

9    allegations in favor of the non-moving party."  *Id.*

10           Relatedly, "courts have inherent power to strike inappropriate materials such as

11   confidential mediation and settlement information that are improperly part of the public record."

12   *Jones v. Metro. Life Ins. Co.*, No. C-08-03971-JW (DMR), 2010 WL 4055928, at *6 (N.D. Cal.

13   Oct. 15, 2010).  The ability to employ such a sanction for improper litigation conduct aids in a

14   court's ability to manage its docket.  *See Ready Transp., Inc. v. AAR Mfg., Inc.*, 627 F.3d 402, 404

15   (9th Cir. 2010).

16                    B.      SanMedica's Motion to Strike

17                            i.      Background

18           SanMedica's motion to strike has both a broad and narrow scope.  First, SanMedica seeks

19   to strike the entire TAC because its content does not conform to that of the proposed amended

20   complaint that accompanied Plaintiffs' December 23, 2020 motion to amend.  (ECF No. 189 at

21   13–14.)  Second, the motion directs the Court's attention to paragraphs 95(b) and 96(g) of the

22   TAC, which contain specific allegations about two loans that the Basic Research Enterprise

23   procured.  (ECF No. 9–12.)  SanMedica claims that the only way Plaintiffs could know about the

24   existence of the loans, much less their amounts, is from information from an audited financial

25   statement that Mr. Gay shared with Plaintiffs' counsel during a mediation between October 29,

26   2020 and November 18, 2020.  (*See* ECF No. 189 at 5–6.)  Though he was reluctant to disclose

27   this information, Mr. Gay relented after SanMedica's attorney and the mediator emphasized that

28   it would remain confidential.  (*Id.*)  SanMedica's motion invokes the Court's inherent power to

1   strike rather than Rule 12(f).  (ECF No. 189 at 9.)

2        *ii.*   *The Court will not strike the entire TAC*

3     SanMedica asks the Court to strike the entire TAC because it differs from the proposed

4   amended complaint that Plaintiffs filed along with their motion to amend.  (ECF No. 189 at 13;

5   *see also* ECF No. 118-9 (proposed TAC).)  In making this argument, SanMedica invokes Local

6   Rule 137(c), which requires counsel to attach a proposed amended complaint as an exhibit to a

7   motion to amend.  (ECF No. 189 at 13.)  If the Court grants such a motion, the rule provides,

8   "counsel shall file and serve the document in accordance with these Rules and the Federal Rules

9   of Civil and Criminal Procedure."  E.D. Cal. L.R. 137(c).  Plaintiffs counter that the Court's April

10  26, 2022 order granting leave to amend authorized Plaintiffs to alter the language in the proposed

11  amended complaint.  (ECF No. 194 at 14.)  In that order, the Court explicitly noted the

12  deficiencies of Plaintiffs' proposed alter ego allegations, holding that they "may not survive under

13  a Rule 12(b)(6) challenge."  *Pizana v. SanMedica Int'l LLC*, No. 1:18-cv-00644-DAD-SKO,

14  2022 WL 1241098, at *15 (E.D. Cal. Apr. 27, 2022).  Nevertheless, the Court permitted

15  Plaintiffs' motion to amend, noting that it could "'conceive of additional facts, if formally

16  alleged,' that would support a claim for alter ego liability."  *Id.* (quoting *United States v.*

17  *Corinthian Colls.*, 655 F.3d 984, 995 (9th Cir. 2011)).

18    The Court does not find SanMedica's argument compelling.  Its adherence to such rigid

19  legal formalism would accomplish little beyond producing a perpetual billing machine for the

20  attorneys in this case.  Had Plaintiffs filed the proposed complaint with its admittedly deficient

21  alter ego allegations — and had SanMedica then moved to dismiss those alter ego allegations —

22  the Court would likely have granted the motion with further leave to amend.  Such leave would

23  have permitted Plaintiffs to file an amended complaint without pre-approval of its contents, and

24  the parties would be in the exact position they find themselves now.  Indulging this kind of

25  redundant litigation would be anathema to principles of judicial economy.

26    None of the out-of-circuit district court cases that SanMedica cites persuade the Court

27  otherwise.  As an initial matter, those cases address other local rules, not this district's Rule

28  137(c).  For example, in *Lefevre v. Connexions, Inc.*, No. 3:13-CV-1780-D, 2014 WL 1390861,

at *2–3 (N.D. Tex. Apr. 10, 2014), the district court's order relied on a local rule that specifically addresses the filing of motions to amend.  That rule provides that, upon the granting of a motion to amend, the proposed amended pleading becomes the operative complaint — no further filing is necessary.  *See* N.D. Tex. Civ. R. 15.1.  Rule 137(c) contains no equivalent provision.  Second, in none of the cases that SanMedica cites did the court explicitly point out fatal deficiencies in the proposed amended complaint.  *See, e.g.*, *Hyatt v. Miller*, 1:19 CV 250 MR WCM, 2020 WL 5750864, *2 (W.D. N.C. Sep. 25, 2020) (holding that the court's order granting leave to amend provided no indication that plaintiffs had permission to file a revised complaint).  Given the Court's explicit statements in this case, it was reasonable for Plaintiffs to file a revised amended complaint addressing the deficiencies that the Court noted in its order.

Accordingly, the Court denies SanMedica's motion to strike the entirety of the TAC.

    iii. *The Court will not strike language in paragraphs 95(b) and 96(g) of the TAC*

In its motion, SanMedica appears to move for the Court to strike the entire TAC because of purportedly confidential information that Plaintiffs included in paragraphs 95(b) and 96(g). (*See* ECF No. 9–10.)  It provides no authority, however, to support such a sweeping sanction. Therefore, the Court will construe SanMedica's request as one to strike the specific language regarding loan amounts in paragraphs 95(b) and 96(g).

SanMedica founds its argument in California's confidentiality rules surrounding mediations.  Specifically, California Evidence Code § 1119 states, in full,

> Except as otherwise provided in this chapter:

> (a) No evidence of anything said or any admission made for the purpose of, in the course of, or pursuant to, a mediation or a mediation consultation is admissible or subject to discovery, and disclosure of the evidence shall not be compelled, in any arbitration, administrative adjudication, civil action, or other noncriminal proceeding in which, pursuant to law, testimony can be compelled to be given.

> (b) No writing, as defined in Section 250, that is prepared for the purpose of, in the course of, or pursuant to, a mediation or a mediation consultation, is admissible or subject to discovery, and disclosure of the writing shall not be compelled, in any arbitration, administrative adjudication, civil action, or other noncriminal

8

1    proceeding in which, pursuant to law, testimony can be compelled to
     be given.

2    (c) All communications, negotiations, or settlement discussions by
     and between participants in the course of a mediation or a mediation

3    consultation shall remain confidential.

4    Cal. Evid. Code § 1119.  These protections continue to apply after a mediation ends.  *Id.* § 1126.

5    "Mediation confidentiality is to be applied where the writing, or statement would not have existed

6    but for a mediation communication, negotiation, or settlement discussion."  *Wimsatt v. Sup. Ct.*,

7    61 Cal. Rptr. 3d 200, 217 (Cal. Ct. App. 2007).  In evaluating whether mediation confidentiality

8    protects a writing or communication, courts must consider "the timing, context, and content of the

9    communication."  *Id.*  Nevertheless, "[e]vidence otherwise admissible or subject to discovery

10   outside of a mediation consultation shall not be or become inadmissible or protected from

11   disclosure solely by reason of its introduction or use in a mediation or a mediation consultation."

12   *Id.* § 1120.  Additionally, while confidentiality may shield a document from disclosure, it does

13   not necessarily preclude disclosure of facts contained in that document.  *Rojas v. Sup. Ct.*, 93 P.3d

14   260, 270 n.8 (Cal. 2004); *Wimsatt*, 61 Cal. Rptr. 3d at 215.  This rule prevents parties from using

15   § 1119 as "a pretext to shield materials from disclosure."  *Rojas*, 93 P.3d at 266 (citation and

16   internal quotation marks omitted).

17        SanMedica argues that mediation confidentiality shields the allegations of specific loan

18   amounts from disclosure because Mr. Gay provided that information only upon assurances from

19   defense counsel and the mediator that it would remain confidential.  (ECF No. 198 at 3.)  This

20   context, SanMedica argues, cuts toward a finding of confidentiality despite the fact that

21   SanMedica did not prepare the financial statements containing the loan information specifically

22   for the mediation.  (*Id.*)  SanMedica's argument misses the mark.  First, Mr. Gay's reliance on

23   advice from SanMedica's attorney and the mediator does not bind Plaintiffs' counsel.  In fact, the

24   mediation agreement that SanMedica attached to its motion explicitly states, in capital letters,

25   "THE MEDIATOR'S STATEMENTS DO NOT CONSTITUTE LEGAL ADVICE TO ANY

26   PARTY."  (Mediation Agreement, ECF No. 189-5 at 3.)  Nor does Mr. Gay state that Plaintiffs'

27   counsel made any similar assurances regarding the confidentiality of the underlying facts in the

28   financial statements.  (*See* Gay Decl., ECF No. 189-1.)

9

1    Second, and more importantly, the question here is not whether the financial statements

2    that Mr. Gay provided during mediation are subject to confidentiality — that may or may not be

3    the case, and the Court expresses no opinion on the matter in this Order.  Rather, the issue is

4    whether mediation confidentiality shields facts contained within the financial statements.  *See,*

5    *e.g.*, *Liberty Mut. Fire Ins. Co. v. Bosa Dev. Cal. II, Inc.*, No. 3:17-cv-0666-AJB-BGS, 2019 WL

6    3306304, at *4 (S.D. Cal. Jul. 23, 2019) ("Thus, the relevant inquiry is whether these documents

7    include facts that are normally discoverable or were truly prepared for mediation.").  In this case,

8    the answer is no.  Plaintiffs did not quote Mr. Gay in the TAC or attach the financial statements as

9    exhibits.  They simply referred to facts that may be otherwise discoverable.  SanMedica argues

10   that whether the information might be discoverable is immaterial — the question, they argue, is

11   whether it can be publicly disclosed.  (ECF No. 198 at 5–6.)  This is not correct.  SanMedica's

12   argument about public disclosure may be relevant to a request to seal the complaint or redact

13   certain information pursuant to Local Rules 141 and 141.1.  If SanMedica seeks to invoke

14   mediation confidentiality to preclude the use of information about loan amounts in the TAC,

15   however, then an assessment of whether that information is otherwise discoverable is directly

16   relevant to the Court's analysis.  SanMedica appears to understand this distinction.  It states that it

17   rejected Plaintiffs' offer to stipulate to sealing portions of the TAC "because it would allow

18   Plaintiffs' counsel to continue to improperly use the Confidential Financial Information in

19   violation of the mediation privilege and mediation confidentiality."  (ECF No. 189 at 8.)  If public

20   disclosure was the only issue, then a stipulation to seal would have accomplished SanMedica's

21   goals.  Because prohibiting use, rather than disclosure, appears to be SanMedica's primary

22   objective, the Court finds SanMedica's argument to be unavailing.[6]

23

---

24   [6]    It could be argued that Plaintiffs should have provided notice to SanMedica that they
25   planned to use potentially confidential information in the complaint pursuant to the Court's
     Standing Order in Civil Actions.  *See* S.O. J. de Alba at 4.  Given SanMedica's rejection of
26   Plaintiffs' offer to redact the language regarding loan amounts in the TAC, however, the Court
     does not think advance notice would have made much of a difference.  Moreover, Plaintiffs
27   compellingly point out that SanMedica never objected to a prior joint filing that contained
     language similar to that in the TAC.  (ECF No. 194-1 at 4.)  In a joint statement regarding
28   SanMedica's motions to quash subpoenas, the parties submitted the following language:

1    Accordingly, SanMedica's motion to strike the loan information in paragraphs 95(b) and

2    96(g) is denied.  The purported violation of mediation confidentiality also formed the basis of

3    SanMedica's motion to disqualify Plaintiffs' counsel.  (*See* ECF No. 190 at 10.)  Because the

4    Court has not found any violation, SanMedica's motion to disqualify is similarly denied.

5                      C.     Mr. Friedlander's Motion to Strike

6        Mr. Friedlander invokes Rule 12(f) in asking the Court to strike paragraphs 72, 73, and 93

7    of the TAC.  Paragraphs 72 and 93 allege that Mr. Friedlander has previously "used an identical

8    scheme to sell fake dietary supplements that do not provide the advertised health benefits" that

9    subjected him to a twenty-year Federal Trade Commission injunction.  (ECF No. 175 at ¶ 72; *see*

10   *also id.* at ¶ 93.)  Paragraph 73 alleges that Mr. Friedlander "has a lengthy record of wrongdoing

11   and violation of federal and state laws," including "cease and desist" and "false representation"

12   orders from the United States Postal Service in connection to marketing and selling dietary

13   supplements.  (*Id.* at ¶ 73.)

14       Mr. Friedlander claims that the allegations at issue not only misconstrue the substance of

15   the prior FTC and Postal Service orders, but also reference conduct "wholly unrelated to

16   Plaintiffs' Complaint."  (ECF No. 218 at 5–6.)  Additionally, this evidence of past acts "invites

17   the fact finder and Court to consider unsubstantiated allegations as the gospel truth" in

18   contravention of Federal Rule of Evidence 608(b).  (*Id.* at 6.)  Plaintiffs, on the other hand, argue

19   _____

20           Indeed, the Individual Defendants have encumbered the Parent
             Companies and Subsidiary Defendants with substantial loans from
21           Zions exceeding the $100 million in revenues derived from the sale
             of SeroVital in California during the Class Period.  To be sure,
22           Phoenix took out a nearly $2 million SBA paycheck protection
             program loan, borrowed from Zions . . . ."

23
24   (ECF No. 176 at 25.)  Contrary to Plaintiffs' assertion, SanMedica claims that this language is not
     "nearly identical" to that in the TAC, but rather contains "a vague speculation . . . of loans in the
25   'millions, if not more than one hundred million dollars.'"  (ECF No. 198 at 8.)  It strains credulity
     to think that the language from the joint statement is not "nearly identical" to — if not more
26   specific than — that in the TAC.  Not only does it mention specific loan amounts correlating to
     those alleged in the TAC, but it also includes the fact that Phoenix took out the $2 million loan as
27   part of the SBA Paycheck Protection Program.  Given SanMedica's stipulation and lack of
     protestation to the language in the joint statement, it was reasonable for Plaintiffs to conclude that
28   alleging the information in a separate publicly filed document would not be objectionable.

                                              11

1   that the allegations are relevant to the litigation because, at minimum, they bear on the issue of

2   punitive damages.  (ECF No. 248 at 56–57.)

3          The Court does not find Mr. Friedlander's arguments persuasive.  First, the allegations at

4   issue are just that — allegations.  The fact that Mr. Friedlander never admitted fault in the FTC

5   action does not mean that Plaintiffs must state so in their complaint.  Nor must they accept Mr.

6   Friedlander's version of events underlying the FTC order.  If Mr. Friedlander wishes to deny his

7   participation in a prior scheme similar to the one at issue in this case, he can do so in an answer.

8   Similarly, Mr. Friedlander argues that "Plaintiffs reference a U.S. Postal Service matter from

9   1985 and misconstrue information to make unreasonable inferences of unlawful action by Mr.

10  Friedlander."  (ECF No. 218 at 6.)  Again, this is an allegation in a complaint.  The Court has no

11  ability to assess which side presents a more compelling version of the order's contents and effects

12  — the adversarial system exists to resolve such disputes.  Similarly, because Plaintiffs'

13  allegations are not evidence, Mr. Friedlander's invocation of Federal Rule of Evidence 608(b) is

14  irrelevant at this juncture.

15         Second, Mr. Friedlander's argument that punitive damages cannot be available based on

16  allegations of prior conduct misreads the very case law he cites.  It is true that "[a] defendant's

17  dissimilar acts, independent from the acts upon which liability was premised, may not serve as the

18  basis for punitive damages."  *State Farm Mut. Ins. Co. v. Campbell*, 538 U.S. 408, 422 (2003).

19  This rule does not, however, bar consideration of, and presentation of evidence related to, prior

20  bad acts in assessing punitive damages.  *See id.* at 423 (holding that courts may punish "a

21  recidivist more severely than a first-time offender" but must "ensure the conduct in question

22  replicates the prior transgressions").  Rather, the relevance and similarity of prior bad acts is a

23  question of fact.  For example, in *Campbell*, the Supreme Court reversed an award of punitive

24  damages because the trial court used the case "as a platform to expose, and punish, the perceived

25  deficiencies of [the defendant's] operations throughout the country" and relied on "dissimilar and

26  out-of-state conduct evidence" in assessing its award of punitive damages.  *Id.*  Because the

27  plaintiffs "identified scant evidence of repeated misconduct of the sort that injured them,"

28  however, the Supreme Court held that trial court's reliance of such dissimilar conduct did not

12

1    support its award of punitive damages. *Id.* at 423. Notably, the Court did not condemn the

2    consideration, and presentation, of evidence related to, those prior acts. Similarly, in *Butte Fire*

3    *Cases*, 235 Cal. Rptr. 3d 228, 231 (Cal. Ct. App.), the Court of Appeals held that the trial court

4    could not assess punitive damages against the defendant for its role in a large-scale wildfire.

5    Specifically, the Court of Appeals affirmed the trial court's conclusion that evidence regarding

6    the defendant's conduct during two prior incidents, one of which involved another wildfire, was

7    too dissimilar from the conduct at issue in the case to warrant punitive damages. *Id.* at 1176. It

8    did not, however, admonish the trial court for hearing evidence related to those prior incidents in

9    order to determine whether they were sufficiently similar.

10        It may be true that, upon presentation of evidence, Mr. Friedlander's alleged prior acts

11    will prove too dissimilar from the conduct at question in this case to support the assessment of

12    punitive damages. This case, however, is still at the pleading stage. Mr. Friedlander's assertions

13    about the dissimilarity between the prior acts and the conduct at question are premature. The

14    question for the Court at this point is whether the allegations have any possible bearing on the

15    subject matter at issue in the litigation. *See Figueroa*, 506 F. Supp. 3d at 1056. Viewing the

16    pleading in the light most favorable to Plaintiffs, the Court finds that the allegations against Mr.

17    Friedlander do bear on the question of punitive damages.[7]

18        Accordingly, Mr. Friedlander's motion to strike is denied.

19    **III.    DEFENDANTS' MOTIONS TO DISMISS FOR LACK OF PERSONAL JURISDICTION**

20        All Defendants, except for SanMedica, Novex, and CRM have moved for dismissal based

21    on a lack of personal jurisdiction.

22                      A.    Legal Standard

23        In determining whether they have personal jurisdiction over a defendant, federal courts

24    look either to state law or specific federal statutes. *SEC v. Ross*, 504 F.3d 1130, 1138 (9th Cir.

---

25    [7]    The Court notes that only Plaintiffs' CLRA claim provides an avenue toward punitive

26    damages in this case. *See* Cal. Civ. Code § 3294(a). "Punitive damages are generally not
      available under the UCL or FAL." *Roper v. Big Heart Pet Brands, Inc.*, 510 F. Supp. 3d 903, 926

27    (E.D. Cal. 2020). Similarly, RICO's provision for treble damages, "which are themselves
      punitive in character," precludes an additional award of punitive damages under that statute. *Sw.*

28    *Marine, Inc. v. Triple A Mach. Shop, Inc.*, 720 F. Supp. 805, 810 (N.D. Cal. 1989).

2007).  "California's long-arm jurisdictional statute is coextensive with federal due process requirements."  *Love v. Assoc. Newspapers, Ltd.*, 611 F.3d 601, 608 (9th Cir. 2010) (citing Cal. Code Civ. Proc. § 410.10)).  Therefore, absent a specific federal statute providing otherwise, federal courts in California can exercise personal jurisdiction over non-resident defendants only when there are "minimum contacts" between those defendants and California "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'"  *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1980) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).  Courts must assess individually whether they can exercise personal jurisdiction over each defendant and each claim.  *Calder v. Jones*, 465 U.S. 783, 790 (1984) (jurisdiction over parties); *Action Embroidery Corp. v. Atlantic Embroidery, Inc.*, 368 F.3d 1174, 1180 (9th Cir. 2004) (jurisdiction over claims).  "The strength of contacts required depends on which of the two categories of personal jurisdiction a litigant invokes: specific jurisdiction or general jurisdiction."  *Ranza v. Nike, Inc.*, 793 F.3d 1059, 1068 (9th Cir. 2015).

"[T]he plaintiff bears the burden of demonstrating that jurisdiction is appropriate" in federal court.  *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004).  In the absence of an evidentiary hearing, the plaintiff need only make a prima facie showing that the court has personal jurisdiction.  *Id.*  Courts take as true uncontroverted allegations in the complaint and resolve disputes between parties' affidavits in favor of the plaintiff.  *Id.*  Here, Plaintiffs invoke specific jurisdiction as well as jurisdiction under the federal RICO Act.[8]

*i.   Specific Jurisdiction*

In the Ninth Circuit, courts use a three-part test to assess whether it is appropriate to exercise specific personal jurisdiction:

> (1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;[9]

---

[8]   Plaintiffs do not invoke general jurisdiction, and the Court will, therefore, not address it.

[9]   While "purposefully direct" and "purposefully avail" appear synonymous, the Ninth Circuit views them as distinct, using the purposeful availment analysis to address suits sounding

14

(2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and

(3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.

*Picot v. Weston*, 780 F.3d 1206, 1211 (9th Cir. 2015).  If the plaintiff makes a prima facie showing to satisfy the first two prongs, "the burden shifts to [the defendant] to set forth a 'compelling case' that the exercise of jurisdiction would not be reasonable."  *CollegeSource, Inc. v. AcademyOne, Inc.*, 653 F.3d 1066, 1076 (9th Cir. 2011).

### 1.        Purposeful Direction

"Where allegedly tortious conduct takes place *outside* the forum and has effects inside the forum," the Ninth Circuit uses the "effects" test of *Calder v. Jones*, 465 U.S. 783 (1984).  *AMA Multimedia, LLC v. Wanat*, 970 F.3d 1201, 1208 (9th Cir. 2020).  "Under this test, 'the defendant allegedly must have (1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum states.'"  *Id.* (quoting *Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218, 1228 (9th Cir. 2011)).  An intentional act is one where the defendant has "an intent to perform an actual, physical act in the real world, rather than an intent to accomplish a result or consequence of that act."  *Schwarzenegger*, 374 F.3d at 806.  In assessing whether a defendant's conduct is expressly aimed at the forum state, courts "must look to the defendant's 'own contacts' with the forum, not to the defendant's knowledge of a plaintiff's connections to a forum."  *Axiom Foods, Inc. v. Acerchem Int'l, Inc.*, 874 F.3d 1064, 1070 (9th Cir. 2017) (citing *Walden v. Fiore*, 571 U.S. 277, 289–90 (2014)).  "Regardless of where a plaintiff lives or works, an injury is jurisdictionally relevant only insofar as it shows that the defendant has formed a contact with the forum state."  *Walden*, 571 U.S. at 290.  Additionally, "[t]he placement of a product into the stream of commerce, without more, is not an act purposefully directed toward a forum state."  *Holland Am. Line Inc. v. Wartsila N. Am., Inc.*, 485 F.3d 450, 459 (9th Cir. 2007).  Courts require "something more," such as evidence of

in contract and the purposeful direction analysis for suits sounding in tort.  *See Schwarzenegger*, 374 F.3d at 802; *Ogdon v. Grand Canyon Univ., Inc.*, No. 1:20-cv-00709-DAD-SKO, 2022 WL 846973, at *11 n.5 (E.D. Cal. Mar. 22, 2022).  As the parties recognize, the instant suit sounds in tort, so the Court will use the purposeful direction analysis.

"designing the product for the market in the forum State, advertising in the forum State, establishing channels for providing regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum States." *Asahi Metal Indus. Co., Ltd. v. Sup. Ct. of Cal., Solano Cnty.*, 480 U.S. 102, 112 (1987).  Finally, "[i]f a jurisdictionally sufficient amount of harm is suffered in the forum state, it does not matter that even more harm might have been suffered in another state." *Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199, 1207 (9th Cir. 2006).

### 2.      Claim arising out of or relating to forum-related activities

Even when a defendant has purposefully directed its activities at the forum state, courts will not exercise personal jurisdiction absent "an affiliation between the forum and the underlying controversy, principally, [an] activity or occurrence that takes place in the forum State and is therefore subject to the State's regulation." *Bristol-Myers Squibb Co. v. Sup. Ct. of Cal., S.F. Cnty.*, 137 S. Ct. 1773, 1780 (2017) (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)).  Nevertheless, courts do not require a "strict causal relationship between the defendant's in-state activity and the litigation." *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1026 (2021).  Therefore, in circumstances where causation is difficult to prove, courts will find relatedness between a plaintiff's injury and the defendant's contacts when "similar injuries will tend to be caused by those contacts" and "the defendant should have foreseen the risk that its contacts might cause injuries like that of the plaintiff." *Yamashita v. LG Chem, Ltd.*, No. 20-17512, 2023 WL 2374776, at *6 (9th Cir. Mar. 6, 2023).

### 3.      Reasonableness

Even when a plaintiff has satisfied the first two prongs of the specific jurisdiction analysis, a defendant can still rebut jurisdiction by presenting a "compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476–77 (1985).  In determining whether a defendant has made such a compelling case, courts in the Ninth Circuit consider seven factors:

> (1) the extent of the defendants' purposeful interjection into the forum state's affairs; (2) the burden on the defendant of defending in the forum; (3) the extent of conflict with the sovereignty of the

16

defendants' state; (4) the forum state's interest in adjudicating the dispute; (4) the most efficient judicial resolution of the controversy; (6) the importance of the forum to the plaintiff's interest in convenient and effective relief; and (7) the existence of an alternative forum.

*Core-Vent Corp. v. Nobel Industries AB*, 11 F.3d 1482, 1487–88 (9th Cir. 1993).

### ii.   Derivative personal jurisdiction

"[A] person's mere association with a corporation that causes injury in the forum state is not sufficient in itself to permit that forum to assert jurisdiction over the person." *Davis v. Metro Prods., Inc.*, 885 F.2d 515, 520 (9th Cir. 1989).  Courts can ignore this rule "in two circumstances: (1) where the corporation is the agent or alter ego of the individual defendant or (2) by virtue of the individual's control of, and direct participation in the alleged activities." *Mulato v. Wells Fargo Bank, N.A.*, 76 F. Supp. 3d 929, 945 (N.D. Cal. 2014) (quoting *j2 Global Commc'ns, Inc. v. Blue Jay, Inc.*, No. 98-cv-4254 PJH, 2009 WL 29905, at *5 (N.D. Cal. Jan. 5, 2009).)  The alter ego theory of personal jurisdiction can also apply to corporate entities that have a parent-subsidiary relationship.  *See Ranza*, 793 F.3d at 1073.  Under both theories, "[d]isregarding the corporate entity is recognized as an extreme remedy, and [c]ourts will pierce the corporate veil only in exceptional circumstances." *Calvert v. Huckins*, 875 F. Supp. 674, 678 (E.D. Cal. 1995) (citation and internal quotation marks omitted).

### 1.   Alter ego

As the Court has previously held, Utah and Delaware law govern Plaintiffs' alter ego claims in this case.  *See Pizana v. SanMedica Int'l LLC*, No. 1:18-cv-00644-DAD-SKO, 2022 WL 1241098, at *13 (E.D. Cal. Apr. 27, 2022).  To establish alter ego jurisdiction under Utah law, "(1) there must be such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist . . . ; and (2) the observance of the corporate form would sanction a fraud, promote injustice, or an inequitable result would follow." *Norman v. Murray First Thrift & Loan Co.*, 596 P.2d 1028, 1030 (Utah 1979).  To assess whether a unity of interest exists, courts consider "(1) undercapitalization of a one-man corporation; (2) failure to observe corporate formalities; (3) nonpayment of dividends; (4) siphoning of corporate funds by

1   the dominant stockholder; (5) nonfunctioning of other officers or directors; (6) absence of

2   corporate records; (7) the use of the corporation as a façade for operations of the dominant

3   stockholder or stockholders; and (8) the use of the corporate entity in promoting injustice or

4   fraud." *Colman v. Colman*, 743 P.2d 782, 786 (Utah Ct. App. 1987).  "There is no specific

5   formula of *Colman* factors that a party must establish, and 'it is possible that evidence of even

6   one of the *Colman* factors may be sufficient to' demonstrate a unity of interest under part one of

7   the alter ego inquiry." *Celtig, LLC v. Patey*, No. 2:17-cv-01086, 2019 WL 4779285, at *6 (D.

8   Utah Sep. 30, 2019).

9            Under Delaware law, "the plaintiff must plead facts supporting an inference that the

10  corporation, through its alter-ego, has created a sham entity designed to defraud investors and

11  creditors." *Crosse v. BCBSD, Inc.*, 836 A.2d 492, 497 (Del. 2003).  Common central

12  management, alone, is not sufficient to pierce the corporate veil.  *eCommerce Indus., Inc. v. MWA*

13  *Intel., Inc.*, No. 7471-VCP, 2013 WL 5621678, at *28 (Del. Ch. Sep. 30, 2013).  Rather,

14  Delaware courts consider the following factors in assessing jurisdiction under an alter ego theory:

15  "(1) whether the company was adequately capitalized for the undertaking; (2) whether the

16  company was solvent; (3) whether corporate formalities were observed; (4) whether the dominant

17  shareholder siphoned company funds; and (5) whether in general, the company simply functioned

18  as a façade for the dominant shareholder." *Manichaean Cap., LLC v. Exela Techs., Inc.*, 251

19  A.3d 694 (Del. Ch. 2021).  The inquiry is fact-intensive, and the list of factors is not exclusive.

20  *See Sprint Nextel Corp. v. iPCS, Inc.*, No. 3746-VCP, 2008 WL 2737409, at *11 (Del. Ch. Jul.

21  14, 2008).  Parties carry a "substantial burden" when attempting to pierce the corporate veil

22  because Delaware courts will do so only in exceptional cases.  *Case Financial, Inc. v. Alden*, No.

23  1184-VCP, 2009 WL 2581873, at *4 (Del. Ch. Aug. 21, 2009).

24           As the Court noted in its previous order, there is a split among the district courts in the

25  Ninth Circuit regarding whether the heightened pleading standard of Federal Rule of Civil

26  Procedure 9(b) applies when a plaintiff pleads alter ego liability.  *See Pizana*, 2022 WL 1241098,

27  at *13 n.13.  Plaintiffs argue that Rule 9(b) has no applicability in the context of pleading alter

28  ego claims.  Defendants do not dispute this but assert that conclusory allegations are insufficient

1    to establish alter ego liability.  (ECF No. 224-1 at 14 (quoting *Nevada Fleet LLC v. Fedex Corp.*,

2    No. 2:17-cv-01732-TLN-KJN, 2021 WL 2402953, at *3 (E.D. Call. Jun. 11, 2021).)  This is an

3    accurate reflection of the general pleading standard, which requires courts to assess only non-

4    conclusory facts in determining whether a complaint states a plausible claim for relief.  *See Bell*

5    *Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 677–78 (2009).

6    Because the parties do not actually dispute the proper standard by which to assess the sufficiency

7    of Plaintiffs' alter ego personal jurisdiction allegations, the Court will not apply the heightened

8    pleading standard of Rule 9(b).

9                              **2.      Direction and control**

10       "A corporate officer or director is, in general, personally liable for all torts which he

11   authorizes or directs or in which he participates, notwithstanding that he acted as an agent of the

12   corporation and not on his own behalf."  *Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*,

13   173 F.3d 725, 734 (9th Cir. 1999).  Courts cannot, however, exercise personal jurisdiction over

14   corporate officers based solely on their "mere knowledge of tortious conduct by the corporation."

15   *Wolf Designs, Inc. v. DHR Co.*, 322 F. Supp. 2d 1065, 1072 (C.D. Cal. 2004).  Rather, plaintiffs

16   must present facts demonstrating that the officer acted as the "guiding spirit" or "central figure"

17   behind the corporation's conduct.  *Id.* (quoting *Davis*, 885 F.2d at 524 n.10).

18                              *iii.     RICO Jurisdiction*

19       The RICO statute permits a court to exercise personal jurisdiction beyond the scope of the

20   Constitution, if "the ends of justice require that other parties residing in any other district be

21   brought before the court."  18 U.S.C. § 1965(b); *Rupert v. Bond*, 68 F. Supp. 3d 1142, 1161 (N.D.

22   Cal. 2014).  In order for the court to invoke personal jurisdiction under § 1965(b), it "must have

23   personal jurisdiction over at least one of the participants in the alleged multidistrict conspiracy

24   and the plaintiff must show that there is no other district in which a court will have personal

25   jurisdiction over all of the alleged co-conspirators."  *Butcher's Union Local No. 498, United Food*

26   *& Com. Workers v. SDC Inv., Inc.*, 788 F.2d 535, 539 (9th Cir. 1986).

27   ///

28   ///

19

**B.**   The Court cannot exercise personal jurisdiction over the RICO claim

All the parties agree on the jurisdictional limits of § 1965(b).  They also agree that every Defendant — except for Mr. Friedlander — is subject to personal jurisdiction in Utah.  The sole question for this Court, then, is whether Utah courts can exercise personal jurisdiction over Mr. Friedlander.

Plaintiffs claim that Mr. Friedlander is not subject to personal jurisdiction in Utah because he is a resident of Nevada and has "disclaimed any and all allegations that he participated in the Basic Research Enterprise."  (ECF No. 279 at 53.)  Plaintiffs walk a vanishingly thin line, as they assert, just pages before their RICO argument, that Mr. Friedlander is an alter ego of every single one of the Entity Defendants, which, the TAC alleges, all operate out of Salt Lake City, Utah.  (*See* ECF No. 279 at 45; ECF No. 175 at ¶¶ 37–44.)  Moreover, Plaintiffs' arguments fail for two separate reasons.  First, while Mr. Friedlander's residency in Nevada may not subject him to general jurisdiction in Utah, it does not foreclose the possibility that Utah courts can exercise specific jurisdiction over him.  Second, the assertion that Mr. Friedlander "disclaimed any and all allegations that he participated in the Basic Research Enterprise" is patently false.  While Mr. Friedlander's affidavit disclaims an ownership interest in the Entity Defendants or any affiliation with them since 2017, (Friedlander Decl., ECF No. 217-1, at ¶¶ 8–9), it asserts that he worked as a marketing consultant for some of the Entity Defendants from 2015 through 2017 and does not deny that he was an employee of the Basic Research Enterprise until 2014, (*id.* at ¶¶ 6–7).  In fact, the only way that Mr. Friedlander's conduct would be relevant to a RICO claim is if he worked with the Basic Research Enterprise, which is, as the parties do not dispute, based in Utah.  There is simply no way for Plaintiffs to get around the fact that Mr. Friedlander would be subject to specific personal jurisdiction in Utah.  Therefore, the Court must dismiss Plaintiffs' RICO claim for lack of personal jurisdiction.

///

///

///

///

C.   The Court may exercise personal jurisdiction over BR, Bydex, and Mr. Gay but lacks personal jurisdiction over Limitless, Sierra, Majestic, BR Intermediate, BR Holdings, BR Cos, Mr. Friedlander, Ms. Daines, Ms. Blackett, and Ms. Haws

i.   *Entity Defendants*

a.   *Limitless*

1.   *Limitless' motion for joinder*

Plaintiffs argue that Limitless has waived any objection to personal jurisdiction because it failed to file a timely motion to dismiss, a timely motion for joinder, or an answer asserting affirmative defenses.  (ECF No. 270-1 at 25–26.)  This is not quite true: Limitless' answer explicitly denies that it is subject to personal jurisdiction in California.  (ECF No. 236 at ¶ 107.) Plaintiffs point to no law, and the Court knows of none, holding that a defendant must plead a denial of personal jurisdiction under the "affirmative defenses" section of its answer rather than in the "jurisdiction and venue" section.  Nor do the Federal Rules of Civil Procedure require such formalism — they simply find waiver when a defendant fails to make a motion under Rule 12(b)(2) or fails to "include [the defense] in a responsive pleading."  Fed. R. Civ. P. 12(h)(1).

The history behind Rule 12 bolsters this conclusion.  "Rule 12 was drafted by the Advisory Committee to prevent the dilatory motion practice fostered by common law procedure and many of the codes under which numerous pretrial motions could be made, many of them in sequence — a course of conduct that was pursued often for the sole purpose of delay."  5 Wright and Miller, Federal Practice and Procedure, § 1384.  By compelling a defendant to raise the issue of personal jurisdiction early and often, courts prevent gamesmanship and sandbagging.  *See Peterson v. Highland Music, Inc.*, 140 F.3d 1313, 1318 (9th Cir. 1998).

Here, Plaintiffs filed the TAC on May 18, 2022, and Limitless received a summons on July 13, 2022.  (ECF Nos. 175, 203.)  On July 22, 2022, the Court granted the parties' stipulation to alter the briefing schedule, which set the deadline for responsive pleadings on August 29, 2022. (ECF No. 206.)  Limitless filed its motion for joinder, its answer, and a motion for judgment on the pleadings all on September 2, 2022, four days after the deadline.  (ECF Nos. 234, 236, 237.) In its reply to Plaintiffs' opposition, Limitless attached an email exchange between its counsel

21

1    and Plaintiffs' counsel.  (ECF No. 263-1.)  The exchange reveals that counsel for Limitless had

2    either forgotten the August 29 deadline or recorded it incorrectly in his calendar.  (*Id.* at 3.)

3    When he asked Plaintiffs' counsel to stipulate to an extension of time to file a Rule 12(b) motion,

4    Plaintiffs' counsel declined, but did consent to a late filing of Limitless' answer.  (*Id.*)

5         The Court does not think that Limitless' conduct evinces the kind of strategically dilatory

6    motion practice that Rule 12 seeks to prevent.  The fact that Limitless filed its papers a few days

7    late does not mean they have waived personal jurisdiction as a defense, and Plaintiffs have

8    provided no law to the contrary.  In fact, even in cases where defendants have been subject to a

9    default judgment, courts have held that the failure to respond to the pleading in a timely manner

10   does not constitute a waiver of the personal jurisdiction defense.  *See Vazquez-Robles v.*

11   *CommoLoCo, Inc.*, 757 F.3d 1, 3–4 (1st Cir. 2014); *Reynolds v. Int'l Amateur Athletic Fed'n*, 23

12   F.3d 1110, 1120–21 (6th Cir. 1994) (listing cases).

13        In the alternative, Plaintiffs argue that Limitless' joinder is insufficient because it does not

14   include any "analysis, facts, authority, or argument" to support its position.  (ECF No. 270-1 at

15   26.)  Plaintiffs are unable to respond to Limitless' motion because they cannot "know[] what it

16   is."  (*Id.*)  This argument is unconvincing.  First, if the motion for joinder did contain argument,

17   Plaintiffs would no doubt argue that the Court should disregard it as untimely filed, and the Court

18   would likely agree.  *See LiveOps, Inc. v. Teleo, Inc.*, No. C05-03773 MJJ, 2006 WL 83058, at *1

19   n.2 (N.D. Cal. Jan. 9, 2006) (striking substantive arguments in a motion for joinder because it was

20   filed late, but nevertheless entertaining the party's motion to the extent it adopted the co-

21   defendant's moving papers).  Second, the personal jurisdiction arguments with which Limitless

22   seeks to join are relatively straightforward.  Limitless cites to section III.A.1(b) of the Entity

23   Defendants' motion, which challenges specific jurisdiction based on the lack of individualized

24   allegations in the TAC and the limited alleged California contacts of the Basic Research

25   Enterprise as a whole.  (*See* ECF No. 220 at 16–17.)  These are arguments that Plaintiffs address

26   for each of the other Defendants, and it is not clear why it would be so difficult for them to do the

27   same for Limitless.  Indeed, Plaintiffs, in their opposition, do address how these arguments apply

28   to Limitless.  (*See* ECF No. 270-1 at 33–34.)  Given that Limitless has preserved its personal

1    jurisdiction objection through its answer, the Court finds that it would be a waste of judicial

2    resources and antithetical to the spirit of Rule 12 to ignore Limitless' motion for joinder.

3                               *2.     The Court does not have personal jurisdiction over*

4                                                *Limitless*

5           After these threshold inquiries, resolving the substance of the personal jurisdiction

6    question is straightforward.  The TAC alleges that Limitless is the maker of the HGH

7    supplements Thrive and Serodyne.  (ECF No. 175 at ¶ 43.)  It also alleges that the formula of both

8    Thrive and Serodyne is identical to that of SeroVital and Growth Factor 9.  (*Id.* at ¶ 6.)  The sale

9    of Thrive and Serodyne under the auspices of a seemingly independent entity creates "a false

10   impression of legitimacy" for SeroVital and Growth Factor 9 by fostering an artificially

11   competitive marketplace for HGH supplements.  (*See id.* at ¶ 96(b).)  The TAC states that

12   Limitless sells Thrive and Serodyne "across California and the United States" and directs

13   advertising to "consumers in California and around the country."  (*Id.* at ¶¶ 123, 125, 127, 129.)

14   Throughout the class period, the TAC alleges, Limitless "oversaw shipments of their fraudulently

15   advertised Products from the BR Headquarters in Utah to consumers in California and around the

16   country."  (*Id.* at ¶ 195.)  None of the individual plaintiffs allege that they themselves ever

17   purchased either Thrive or Serodyne.  (*See id.* at ¶¶ 16–33.)  Nor do Plaintiffs provide any sales

18   numbers for either product.  Instead, they ask the Court to infer that Thrive and Serodyne sold

19   equally as well in California as SeroVital.  (ECF No. 270-1 at 32.)  They, however, provide no

20   authority to support such an assertion.

21          Based on the above, the Court is not inclined to exercise direct personal jurisdiction over

22   Limitless.  Plaintiffs have not demonstrated the existence of a single sale of either Thrive or

23   Serodyne in California.  They therefore fail to demonstrate any intentional acts expressly aimed at

24   the forum state.  The most the Court can ascertain from the TAC is that Limitless placed its

25   products into the stream of commerce and that some unspecified number of Californians may

26   have purchased them.  There is no information in the TAC or Plaintiffs' opposition that allows the

27   Court to determine whether these sales were substantial or merely sporadic.  *See Boschetto v.*

28   *Hansing*, 539 F.3d 1011, 1020 (9th Cir. 2008).  Plaintiffs have, therefore, failed to make out a

1    prima facie case for direct personal jurisdiction over Limitless.

2                              *3.     The Court cannot exercise personal jurisdiction*

3                                      *under an alter ego theory.*

4         Plaintiffs, citing to public Secretary of State records, trace numerous connections between

5    Limitless, the Entity Defendants, and the Individual Defendants.  (*See* ECF No. 270-1 at 46–49.)

6    They argue that there is a history of common ownership between Limitless and the rest of the

7    Entity Defendants, contrary to the declaration that Melyn Campbell filed along with Limitless'

8    Motion for Judgment on the Pleadings.  (*Id.*)  While this information is provocative, it is

9    insufficient to cause the Court to pierce the corporate veil.  Allegations of common ownership,

10   alone, are not sufficient to support an alter ego theory of personal jurisdiction.  *See In re Phillips*

11   *Petro. Sec. Litig.*, 738 F. Supp. 825, 838 (D. Del. 1990); *US Magnesium, LLC v. ATI Titanium,*

12   *LLC*, No. 2:16-CV-1158 TS, 2017 WL 913596, at *7 (D. Utah Mar. 7, 2017) (quoting *Quarles v.*

13   *Fuqua Indus., Inc.*, 504 F.2d 1358, 1364 (10th Cir. 1974)).  Plaintiffs have provided no other facts

14   to support their alter ego argument.  While they allege that Limitless works out of the same

15   building as the Entity Defendants in Salt Lake City, Ms. Campbell's declaration contradicts this.

16   She states that Limitless rented office space at BR Headquarters from 2012 to 2019 but kept

17   separate office spaces within the building and used a designated entryway.  (Campbell Decl., ECF

18   No. 237-1, at ¶ 14.)  Since 2019, Limitless has conducted its business from a separate location.

19   (*Id.* at ¶ 13.)  Because there is no other information in the TAC relevant to a finding of a "unity of

20   interest" between Limitless and the other defendants, the Court will refrain from exercising

21   personal jurisdiction under an alter ego theory.

22                              *b.      The Court can exercise personal jurisdiction over BR*

23        Plaintiffs claim this Court has personal jurisdiction over BR because it acts as the

24   "exclusive distributor" of SeroVital, Thrive, Serodyne, and Growth Factor 9.  (ECF No. 270-1 at

25   33.)  It is, therefore, directly responsible for providing California retailers with the products that

26   ended up in Plaintiffs' hands.  (*Id.*)  BR, on the other hand, argues that the TAC nowhere

27   describes BR as an "exclusive distributor."  (ECF No. 261 at 3.)  Moreover, the allegations in the

28   TAC fail to provide jurisdictionally relevant facts specific to it.  (ECF No. 220 at 16.)  Instead, it

                                              24

1    contends, the TAC describes only collective conduct on behalf of all Defendants, which is

2    insufficient to support personal jurisdiction.  (*Id.*)  This is not, however, entirely true.  The TAC

3    maintains that BR is a distributor for all the products at issue in this litigation.  (ECF No. 175 at ¶

4    37, 95(c).)  While it is true that Plaintiffs levy certain allegations against all Defendants — that

5    they, for example, "deliberately and intentionally . . . sold hundreds of millions of dollars' worth

6    of the Products to hundreds of thousands of California consumers" — this is not a fatal flaw.  (*See*

7    ECF No. 175 at ¶ 53.)  The Court may draw reasonable inferences from the complaint and must

8    resolve any factual disputes in Plaintiffs' favor.  *See Lindora, LLC v. Isagenix Int'l, LLC*, 198 F.

9    Supp. 3d 1127, 1136 (S.D. Cal. 2016).  It is reasonable for the Court to infer that, as the alleged

10   distributor for Defendants' products, BR is the entity responsible for placing "hundreds of

11   millions of dollars' worth of the Products" into the market, even if the TAC does not state so

12   explicitly.  Plaintiffs also proffer additional materials suggesting that BR, through SanMedica,

13   distributed a specific number of units of SeroVital in California since 2013, resulting in a specific

14   amount in gross sales.  (Ex. 14 at 1; Bruce Decl. at ¶ 2(n).)

15        While it would not be appropriate for the Court to accept Plaintiffs' assertions in the face

16   of a contradictory affidavit, *see Mavrix Photo*, 647 F.3d at 1223, BR's affidavit does not dispute

17   its status as a distributor.  It simply states that BR has "no employees or physical locations in

18   California, and [has] never sold the Product to anyone in California."  (ECF No. 220-1 at 4, Gay

19   Decl., ECF No. 222-4, at ¶ 10.)  It is true that the TAC makes no claims about BR's physical

20   presence in California or its participation in direct sales in the state.  This makes sense — it is not

21   Plaintiffs' asserted basis for personal jurisdiction.  The question, then, is whether BR's status as a

22   distributor, combined with allegations regarding the number of units of SeroVital sold within

23   California are sufficient to establish a prima facie case for personal jurisdiction.

24                              *1.    Purposeful direction*

25        The parties' purposeful direction argument focuses on whether BR's acts as a distributor

26   were expressly aimed at California.  (*See* ECF No. 220 at 17.)  BR argues that Plaintiffs'

27   allegations about nationwide distribution of SeroVital preclude a finding of express aiming

28   toward California.  (*Id.*)  The fact that BR distributes products to states other than California,

1    however, is not dispositive.  Courts have repeatedly held that, when a defendant makes substantial

2    and regular sales in a forum, it has purposefully directed itself there.  For example, in *Keeton v.*

3    *Hustler Magazine, Inc.*, 465 U.S. 770, 772 (1984), the plaintiff, who was a resident of New York,

4    sued the defendant magazine, which was a resident of both Ohio and California, in New

5    Hampshire.  The Court held that the defendant's monthly circulation of between 10,000 and

6    15,000 copies of its magazine in New Hampshire was not "random, isolated, or fortuitous," and

7    was, therefore, sufficient to demonstrate purposeful direction.  *Id.* at 772–74.  This was the case

8    even though the defendant's circulation in New Hampshire constituted a small portion of its

9    nationwide distribution.  *Id.* at 775–76; *see also Ayla, LLC v. Alya Skin Pty. Ltd.*, 11 F.4th 972,

10   981 (9th Cir. 2021) (finding purposeful direction where company shipped nearly ten percent of its

11   products to the forum).  BR's citation to *Grober v. Mako Prods., Inc.*, 686 F.3d 1335, 1347 (Fed.

12   Cir. 2012), is not to the contrary.  In *Grober*, the plaintiff tried to establish specific jurisdiction in

13   California over a Washington-based company that rented camera equipment to the movie and

14   television industry.  *Id.* at 1345.  The plaintiff, however, could only allege the "shipment of an

15   unspecified amount of products" between the defendant rental company and recipients in

16   California.  *Id.* at 1347.  None of those products included the specific one at issue in the litigation.

17   *Id.*  Moreover, the defendant conducted no other operations in California beyond advertising

18   twice yearly in a nationally distributed magazine based in California.  *Id.*

19        The allegations in the instant case differ dramatically from those in *Grober*.  Plaintiffs

20   have alleged that BR, acting as distributor, contributed to the sale of over one million units of

21   SeroVital in California over the past decade, resulting in gross revenue of over $90 million.[10]

22   Unlike in *Grober*, Plaintiffs have made a prima facie case of specified sales in the forum state of

23   one of the products at issue in the case.  It is difficult for the Court to describe this conduct as

24   anything but continuous and substantial.  Moreover, the fact that BR is an out-of-state entity with

25   no physical location in California is not dispositive.  Such was the case in *Keeton*, where the

26

27   [10]      This total does not include figures for the distribution of Thrive, Serodyne, or Growth
     Factor 9.  Nevertheless, the allegations pertaining to SeroVital, standing alone, are sufficient for
28   the Court to exercise personal jurisdiction.

1    Defendant had no connection to the forum state beyond circulation of its magazine there.  Nor is

2    it relevant that BR did not act as a direct seller.  As a distributor, it does not simply place its

3    products in the stream of commerce to float where they may — it controls their ultimate

4    destination.  *Cf. Ayla*, 11 F.4th at 981 ("Further, [the defendant] is not a parts manufacturer with

5    no control over the ultimate distribution of its products.").  The extent of the alleged distribution

6    in this case is sufficient to find that BR expressly aimed its conduct at California.

7                                *2.       Arising out of forum-related activities*

8           BR's claim that the number of sales made in California is irrelevant to the "arising out of"

9    element of the personal jurisdiction analysis is similarly unavailing.  It cites to *Bristol-Myers*

10   *Squibb* for the proposition that "even regularly occurring sales of a product in a State do not

11   justify the exercise of jurisdiction over a claim unrelated to those sales."  (ECF No. 220 at 17

12   (quoting *Bristol-Myers Squibb*, 137 S. Ct. at 1781).)  This quotation misses the point: the claim in

13   this case is *directly* related to BR's distribution of SeroVital in California.  Plaintiffs allege that

14   they purchased SeroVital in California, where they also experienced economic injury stemming

15   from the fact that the product did not perform as advertised.  This is a direct causal relationship

16   sufficient to satisfy the second element of the specific jurisdiction analysis.

17                                      *3.       Reasonableness*

18          BR has not proffered any argument regarding the third prong of the personal jurisdiction

19   analysis — whether the exercise of personal jurisdiction is reasonable.  It has failed, therefore, to

20   carry its burden to rebut Plaintiffs' assertion of jurisdiction.[11]

21                    *c.       The Court can exercise personal jurisdiction over Bydex*

22          The Court's conclusion that it has personal jurisdiction over BR necessarily allows it to

23   exercise personal jurisdiction over Bydex under the agency theory that Plaintiffs propose in their

24   briefing.  (*See* ECF No. 270-1 at 35–37.)  "For purposes of personal jurisdiction, the actions of an

25   agent are attributable to the principal."  *Sher v. Johnson*, 911 F.2d 1357, 1362 (9th Cir. 1990).

26

27   _____

     [11]     BR joins with the other Defendants in moving to transfer venue, which requires a similar
28   analysis to the reasonableness prong of the personal jurisdiction test.  The Court will address the
     issue of venue later in this Order.

1   This rule permits courts to exercise personal jurisdiction based on an employee's conduct that

2   state law attributes vicariously to an employer.  *See CollegeSource*, 653 F.3d at 1078.  Under

3   California law, "an innocent employer may be liable for the torts its employee commits while

4   acting within the scope of his employment." *Yamaguchi v. Harnsmut*, 130 Cal. Rptr. 2d 706, 712

5   (Cal. Ct. App. 2003).  In determining whether an employer is vicariously liable, courts ask

6   whether the conduct "(1) is required by or incidental to the employee's duties, or (2) it is

7   reasonably foreseeable in light of the employer's business." *Montague v. AMN Healthcare, Inc.*,

8   168 Cal. Rptr. 3d 123, 127 (Cal. Ct. App. 2014).  Multiple employers can be vicariously liable for

9   a single employee's conduct, and the original employer "is absolved of respondeat superior

10  liability when it has relinquished total control to the [secondary] employer." *Id.* at 126.  In

11  determining whether an employer-employee relationship remains, courts consider, "among other

12  factors, whether the employee must obey instructions from the employer and whether 'there was a

13  right to terminate the service at any time.'" *Jimenez v. U.S. Cont'l Mktg., Inc.*, 254 Cal. Rptr. 3d

14  66, 72 (Cal. Ct. App. 2019) (quoting *Bradley v. Dep't of Corr. & Rehab.*, 71 Cal. Rptr. 3d 222,

15  231 (Cal. Ct. App. 2008)).

16        Here, the TAC alleges Bydex pays the salaries of all employees within the Basic Research

17  Enterprise, including those who work for BR.  (ECF No. 175 at 96(a), (e).)  Bydex does not argue

18  that it ever relinquished control of these employees.  Moreover, the facts, as alleged, indicate that

19  Bydex's employees, while staffing BR, acted incidentally, and in a reasonably foreseeable

20  manner, to their employment with Bydex.  By distributing SeroVital to customers in California,

21  the employees at BR did precisely what Bydex placed them there to do.  *Cf. Pitt v. Metro. Tower

22  Life Ins. Co.*, No. 18-cv-06609-YGR, 2020 WL 1557429, at *5 (N.D. Cal. Apr. 1, 2020)

23  (defendant, an internal staffing agency, offered "unrebutted testimony" that it did not exercise

24  control over its employees after staffing them at a separate subsidiary corporation).

25        Similar to BR, Bydex makes no arguments regarding the reasonableness of this Court's

26  exercise of personal jurisdiction.

27  ///

28  ///

28

1              *d.       The Court cannot exercise direct personal jurisdiction over*
2                        *Sierra because Plaintiffs have failed to demonstrate that*
3                        *their claim arises out of Sierra's contacts with California.*

4          Plaintiffs argue that the Court has jurisdiction over Sierra because the company used the

5    credentials of Dr. Heaton to advertise SeroVital in California.  (ECF No. 270-1 at 35.)  They also

6    state that Sierra employed two experts — Susan Pekarovics and Colleen Kelley — from

7    California in conducting the 2012 clinical trial that the Basic Research Enterprise uses to

8    advertise and sell SeroVital.  (*Id.* at 34.)  Sierra contends these allegations provide no direct links

9    between Sierra and California, but instead rely on an agency theory of personal jurisdiction

10   without citation to case law or the TAC.  (ECF No. 261 at 3.)  The Court agrees that Plaintiffs'

11   arguments in their opposition are insufficient to satisfy the purposeful direction prong of the

12   personal jurisdiction analysis.  Plaintiffs do not state whether the 2012 study was conducted in

13   California.  Nor do they demonstrate the relevance of Ms. Pekarovics and Ms. Kelley's residency

14   in California for purposes of specific jurisdiction.  Additionally, the allegations in the TAC do not

15   support Plaintiffs' assertion that Dr. Heaton "traveled throughout California" advertising

16   SeroVital.  (*See* ECF No. 270-1 at 35.)  In fact, the TAC alleges that Dr. Heaton attended a single

17   conference in San Francisco in 2013.  (ECF No. 175 at ¶ 53.)  The TAC does not allege any facts

18   about the conference — for example, whether it consisted mainly of California individuals and

19   businesses, or whether it invited a national or international audience.  Plaintiffs' bare citation to

20   Dr. Heaton's 371-page deposition transcript fails to provide further elucidation.  It is not the

21   Court's job to comb through exhibits and make a party's arguments for it.  *See Yphantides v.*

22   *Cnty. of San Diego*, No. 21cv1575-GPC (BLM), 2023 WL 1805868, at *1 (S.D. Cal. Feb. 7,

23   2023); *Zackaria v. Wal-Mart Stores, Inc.*, No. ED CV 12-1520 FMO (SPx), 2014 WL 11398759,

24   at *3 (C.D. Cal. Feb. 21, 2014).

25         Nevertheless, the TAC contains one allegation that may demonstrate purposeful direction.

26   Plaintiffs allege that "one of Defendants' purported substantiating studies for the Products was

27   conducted in Los Angeles."  (ECF No. 175 at ¶ 53.)  Even if this fact were sufficient to show

28   purposeful direction, however, it would not meet the "arising out of" prong of the personal

jurisdiction analysis.  While the TAC alleges that Sierra produced "misleading self-funded studies to deceive customers into thinking the Products provide anti-aging benefits," it does not state whether the LA study was the 2012 one that appears to be the primary foundation for advertising the products at issue in this case.  (*See* ECF No. 175 at ¶ 170; ECF No. 270-1 at 34.)  Nor do Plaintiffs provide much insight into how many studies Sierra has performed outside of California. Based on the allegations in the complaint, it is impossible for the Court to determine how much of an impact the LA study had on Plaintiffs' decisions to purchase the products at issue in this case. Therefore, the Court is unable to determine whether the claims in this case arise out of Sierra's contacts with California.  *Cf. Cortina v. Bristol-Myers Squibb Co.*, No. 17-cv-00247-JST, 2017 WL 2793808, at *4 & n.3 (N.D. Cal. Jun. 27, 2017) (finding personal jurisdiction over pharmaceutical company where "nearly every pivotal clinical trial necessary for NDA approval involved studying" the drug in the forum state but recognizing that a "*de minimis* level of clinical trial activity" may not satisfy the test for personal jurisdiction).

> e.  *The Court cannot exercise direct personal jurisdiction over Majestic because Plaintiffs have failed to demonstrate purposeful direction*

Plaintiffs, in their opposition brief, assert that "Majestic created the Products' packaging and labels," "crafted each Products' brand strategy," and placed advertisements on websites, television, radio, and print magazines.  (ECF No. 270-1 at 35.)  None of these allegations appear in the TAC.  While the Court may look to materials beyond the complaint, such as declarations, when assessing personal jurisdiction, it would be inappropriate to rely on uncited argumentation in the parties' briefing.  *Cf. Stewart v. Screen Gems-EMI Music, Inc.*, 81 F. Supp. 3d 938, 949 (N.D. Cal. 2015) (discussing the use of pleadings, affidavits, and discovery materials in evaluating personal jurisdiction).  Plaintiffs' citations to certain exhibits does nothing to change this analysis.  One such exhibit is a screenshot of SeroVital's website presenting a Q&A with Dr. Heaton about SeroVital.  (Ex. 9, ECF No. 249-14, at 31.)  Majestic's name appears nowhere on that page, and the allegations in the TAC are too sparse for the Court to make a reasonable inference that Majestic was responsible for the content or design of that webpage.  This is

particularly true considering the other exhibit Plaintiffs cite — an email exchange showing Ms. Daines soliciting marketing advice from what appears to be an outside public relations firm.  (Ex. 13, ECF No. 270-5.)  The TAC nowhere states that Ms. Daines is an employee or officer of Majestic.  Rather, it alleges that she is a spokesperson for SanMedica, Limitless, and Novex. (ECF No. 175 at ¶ 46.)  Given the lack of individualized factual allegations in the TAC, the Court cannot attribute Ms. Daines' conduct to Majestic.  Nor can it make a reasonable inference that Majestic is the sole entity responsible for all marketing and advertising in California when Plaintiffs themselves demonstrate the involvement of an outside public relations firm in the Basic Research Enterprise's marketing efforts.  In sum, apart from describing Majestic as the marketing and advertising arm of the Basic Research Enterprise, the TAC does not delineate any acts on the part of Majestic, much less acts expressly aimed at California sufficient to support a finding of purposeful direction.

     *f.*  *The Court cannot exercise personal jurisdiction under an alter ego theory for BR Intermediate, BR Holdings, BR Cos, Majestic, or Sierra.*

  Plaintiffs argue they have alleged a "unity of interest" to support personal jurisdiction under an alter ego theory in Paragraphs 95–97, 99, and 100–04 of the TAC. (ECF No. 248 at 23–24; ECF No. 270-1 at 42–43.)  Entity Defendants argue the quantity of allegations belies their conclusory nature.  (ECF No. 224-1 at 15–17.)  The Court is inclined to agree with Entity Defendants that many of Plaintiffs' allegations are conclusory.  Moreover, many allegations suffer from the same defects against which the Court previously warned in its order granting Plaintiffs' motion to amend — they generally fail to differentiate among the various Defendants. *See Pizana*, 2022 WL 1241098, at *14.  For example, Paragraph 97 appears to repeat, almost verbatim, the alter ego allegations the Court found deficient in Plaintiffs' proposed amended complaint.  (*See* ECF No. 118-9 at 68–69 (paragraph 197 of the proposed amended complaint).) Similarly, the allegations in Paragraph 95(b) fail to differentiate between the Individual Defendants in alleging that they all "pooled assets in remote owners and debts in immediate actors," "deliberately undercapitalized and underinsured" the Entity Defendants, and "ensured

31

1   none of the Basic Research Enterprise entities have insurance that covers the fraudulent

2   marketing and sale of the Products at issue in this case."

3        Nevertheless, after digging through the TAC, the Court can glean the following factual

4   information: BR, Sierra, Majestic, CRM, Bydex, SanMedica, Limitless, and Novex are all wholly

5   owned subsidiaries of BR Intermediate, BR Holdings, and BR Cos, operating out of the same

6   building in Salt Lake City, Utah, (*see* ECF No. 175 at ¶¶ 37–44); Bydex supplies and pays all of

7   the employees for each of the Entity Defendants, (*id.* at ¶ 96(a)); BR Intermediate, BR Holdings,

8   and BR Cos maintain the corporate records for all of the other Entity Defendants, (*id.* at ¶

9   100(b)); SanMedica, Novex, and Limitless sell the exact same product under different names, (*id.*

10  at ¶ 96(b)); and all Entity Defendants "shared identical officers, directors, supervisors, and/or

11  managers, operated from the same location, and were all owned by the individual Defendant

12  family members partnered with Friedlander, to engage in a singular business enterprise," (*id.* at ¶

13  95(d)).  From these allegations, the Court can also infer that each of the Entity Defendants holds

14  itself out as an independent entity, despite their presence in a common organizational structure.

15       Declarations from various Defendants, however, complicate the allegations regarding

16  common ownership.  As discussed elsewhere in this Order, it is not clear that every Individual

17  Defendant held an ownership interest at the same time as every other Individual Defendant.  Nor

18  is it clear that the Individual Defendants are the only shareholders of each Entity Defendant.  It is,

19  however, clear that, for at least a portion of the class period, outside investors held a majority

20  ownership stake in the Entity Defendants.  (Gay Decl. at ¶ 10.)  Therefore, while the ownership

21  interest of each Individual Defendant is unclear, the fact of overlapping ownership among the

22  Entity Defendants appears to be undisputed.

23       Finally, Plaintiffs describe, in detail, a pattern of liability evasion in the face of impending

24  litigation.  In opposition, Plaintiffs cite to evidence of restructuring among the Entity Defendants

25  in the face of an enforcement action from the FTC in 2004 and following the filing of two class

26  actions in 2014 and one in 2016.  (ECF No. 270-1 at 50–51.)  Similarly, the TAC explains that at

27  the outset of this litigation, BR Intermediate was SanMedica's parent corporation and BR

28  Holdings was its grandparent corporation.  (ECF No. 175 at ¶ 50 n.2.)  In 2020, BR Cos acquired

1    BR Intermediate and became the new umbrella company for the Entity Defendants. (*Id.*)  A 2022

2    supplemental disclosure form from SanMedica following this Court's April 27, 2022 order

3    granting Plaintiffs' motion to amend the complaint, labeled a heretofore unidentified entity —

4    Phoenix Awakening Holdings, LLC — as SanMedica's grandparent corporation. (*Id.*; *see also*

5    ECF No. 270-1 at 51–52.)  Entity Defendants do not deny these reorganizations, but claim they

6    are irrelevant because "Plaintiffs cite no evidence to support their rank speculation that any

7    changes in corporate structure had anything to do with any litigation." (ECF No. 261 at 6 n.7.)

8         Considering the facts in the complaint under Delaware and Utah law, the Court concludes

9    that Plaintiffs have not made out a prima facie case for personal jurisdiction on an alter ego

10   theory.  The only case from either Utah or Delaware to which Plaintiffs analogize is *Microsoft*

11   *Corp. v. Amphus, Inc.*, No. 8092-VCP, 2013 WL 5899003, at *7 (Del. Ch. Oct. 31, 2013), but that

12   case is distinguishable. (ECF No. 248 at 24.)   There, the court found that two corporations were

13   alter egos of each other where they shared "directors, management, and business facilities," and

14   the directors expressed confusion about which corporation they served as directors. *Id.*  One

15   company also supplied and paid for all the employees of the other. *Id.* at *7.

16        In the instant case, Plaintiffs have alleged the Entity Defendants share the same physical

17   address but make no allegations about whether each Entity Defendant maintains distinct office

18   space at that location.  Nor have Plaintiffs pleaded any facts regarding the management or

19   operations of the various entities.  Moreover, Plaintiffs have alleged that Bydex supplies the

20   employees for all the other Entity Defendants, but Bydex is a staffing agency — its purpose is to

21   supply employees.  There is no allegation that the Entity Defendants share Bydex-supplied

22   employees between themselves.  Most importantly, Plaintiffs have not provided facts responsive

23   to the relevant factors under Utah and Delaware law.  They state that the Entity Defendants are

24   undercapitalized, but they provide no individualized facts to support such a conclusion.  The most

25   they do is allege the existence of loans of $100 million and $2 million that the Individual

26   Defendants procured at some point in time. (ECF No. 175 at ¶¶ 95(b), 96(g).)  These loans, on

27   their own, are not necessarily evidence of undercapitalization or overleveraging.  This is

28   especially the case when the allegations fail to distinguish between the roles or actions of any

1    Defendants.  Plaintiffs allege only that the "Individual Defendants" took out the loans and that

2    they used them to undercapitalize and overleverage the Entity Defendants.  Such broad, all-

3    encompassing allegations are not sufficient to make the existence of the loans relevant to the

4    Court's alter ego analysis.  Similarly, Plaintiffs allege no facts regarding the solvency of the

5    Entity Defendants, the nonpayment of dividends, or the siphoning of funds to the dominant

6    shareholder.  Piercing the corporate veil is a strong remedy, and Plaintiffs have not met their

7    burden of demonstrating a "unity of interest" among the Entity Defendants under Utah or

8    Delaware law.

9                        *ii.*     *Individual Defendants*

10        The TAC does not allege that any of the Individual Defendants themselves have sufficient

11   contacts with California to support the exercise of personal jurisdiction.  Rather, they appear to

12   argue that jurisdiction is proper under either an alter ego or direction and control theory.

13                       *a.*     *The Court can exercise personal jurisdiction over Bodee*

14                              *Gay on a direction and control theory*

15        The TAC states that Mr. Gay became CEO of the Basic Research Enterprise in 2016, at

16   which point he "directed, controlled, directly participated in, and has been otherwise responsible

17   for, all aspects of its operations, including the design, implementation, and audit of strategies for

18   the research and development, marketing and advertisement, distribution, sales, customer service

19   divisions, and manufacture of the Products as well as the operation of SanMedica, Limitless

20   Worldwide, and Novex Biotech."  (ECF No. 175 at ¶ 45.)  Additionally, as an executive officer of

21   the Basic Research Enterprise, he was "personally responsible for the design, content, approval,

22   [and] distribution of all product advertisements" and was "ultimately responsible for placing the

23   advertisements . . . into the stream of commerce and for selling the products in interstate

24   commerce."  (*Id.* at ¶ 60.)  In 2018, he took an unspecified ownership interest in the Basic

25   Research Enterprise.  (*Id.* at ¶ 45.)  Mr. Gay attached a declaration to the Gay Defendants'

26   collective motion to dismiss which paints much the same picture.  Mr. Gay states that he became

27   "CEO of the Basic Research Family of Companies" in 2016 and still holds that position.  (Gay

28   Decl., ECF No. 222-4, at ¶ 6.)  He does not deny an ownership interest in the Basic Research

34

1    Enterprise, but states that from 2014 until 2019, a group of venture capitalists maintained a

2    majority ownership interest in the Basic Research Enterprise.  (*Id.* at ¶¶ 10–12.)  Even though he

3    acts as CEO, Mr. Gay has always answered to "a Board of Directors (until late 2019), a senior

4    secured lender that holds a significant warrant to obtain the majority of the companies'

5    ownership, and everyone who has held any kind of ownership interest in the Basic Research

6    Family of Companies."  (*Id.* at ¶ 14.)  Unlike the other Individual Defendants who filed

7    declarations along with the motion to dismiss, Mr. Gay does not disclaim involvement in the

8    formation, capitalization, ownership, insuring, asset control, trademark creation, product

9    formulation, or record maintenance of any of the Entity Defendants.  (*Compare* Gay Decl. *with*

10   Haws Decl., ECF No. 222-1, at ¶ 7; Daines Decl., ECF No. 222-2, at ¶ 9; Blackett Decl., ECF No.

11   222-3, at ¶ 6.)

12         These facts — Mr. Gay's role as CEO, his failure to disclaim the TAC's allegations

13   regarding his authority over operations, sales, distribution, advertisement, and customer service,

14   and his ownership interest in the Basic Research Enterprise — are sufficient for the court to

15   exercise personal jurisdiction over Mr. Gay as a "guiding light" or "central figure" behind the sale

16   and distribution of SeroVital in California.  Mr. Gay argues, along with the rest of the Gay

17   Defendants, that the Court should look to *Ogdon v. Grand Canyon Univ., Inc.*, No. 1:20-cv-

18   00709-DAD-SKO, 2022 WL 846973, at *14 (E.D. Cal. Mar. 22, 2022), as an analogous case

19   warranting dismissal on personal jurisdiction grounds.  (ECF No. 231 at 15.)  There, the

20   defendants were an Arizona non-profit online university registered to do business in California, a

21   Delaware-based holding company registered to do business in California, and three corporate

22   officers of the first two defendants.  *Ogdon*, 2022 WL 846973, at *1.  The plaintiff was a

23   California resident who enrolled with the defendant university after filling out an online form and

24   speaking on the phone with a university counselor.  *Id.* at *2–*3.  The complaint alleged that the

25   defendants operated a fraudulent nationwide marketing and recruitment scheme to enroll students

26   in the university by providing misleading information about whether the university could meet the

27   educational needs of prospective students.  *Id.* at *5.  The district court found that it lacked

28   personal jurisdiction over all defendants in the case and chastised the plaintiff's counsel for

referring to the defendants collectively when discussing their California contacts. *Id.* at *14, 16. Nevertheless, the lumping together of forum state contact allegations was not dispositive — the district court still assessed whether it had personal jurisdiction over each of the individual defendants. *Id.* at *14–*15.

Ogdon differs from this case in that the Court has found it proper to exercise personal jurisdiction over at least some of the Entity Defendants. In *Ogdon*, any control or direction that the executive officer defendants had over the entity defendants was necessarily non-forum related because the district court held that those entity defendants did not have sufficient forum-related contacts for purposes of personal jurisdiction. In this case, however, the Court has held that it has personal jurisdiction over BR and Bydex, and Entity Defendants have conceded personal jurisdiction over SanMedica, Novex, and CRM. Plaintiffs' allegations regarding Mr. Gay's direction and control of the Basic Research Enterprise — or the Basic Research Family of Companies, as Mr. Gay calls it — are sufficient for the Court to find that Mr. Gay was a "central figure" in the operations that subject BR and Bydex to personal jurisdiction in this Court.

Because the Court finds that it has personal jurisdiction under a "direction and control" theory, it will not address Plaintiffs' alter ego theories as they relate to Mr. Gay.

> **b.** *The Court cannot exercise personal jurisdiction over Mitchell Friedlander*

The TAC alleges Mr. Friedlander is the inventor of SeroVital and receives royalty payments for each sale of the product. (ECF No. 175 at ¶¶ 47, 71.) At all times relevant to this litigation, he has been an executive officer of the Basic Research Enterprise. (*Id.* at ¶ 47.) According to Plaintiffs, he has "directed, controlled, directly participated in, and has been otherwise responsible for, all aspects of [the Basic Research Enterprise's] marketing and advertising operations, including the design, implementation, and audit of strategies for marketing and advertising the Products." (*Id.*) They also assert that he has final decision-making authority over all these operations. (*Id.*) Plaintiffs allege Mr. Friedlander is responsible for the design, content, and distribution of the advertisements they each viewed before purchasing the products at issue in this case. (*Id.* at ¶ 69.) Mr. Friedlander's declaration rebuts some of these allegations.

36

1    While he worked as a marketing consultant for some of the Entity Defendants from 2015 to 2017,

2    he has not been an employee or executive officer for any Entity Defendant since 2014.

3    (Friedlander Decl., ECF No. 217-1, at ¶¶ 6–7.)  He has not received royalty payments from any

4    Entity Defendant since 2014 and has done no work for any Entity Defendant since 2017.  (*Id.* at

5    ¶¶ 6, 9.)  He also denies ever having a direct ownership interest or controlling indirect interest in

6    any of the Entity Defendants.  (*Id.* at 8.)  Nor has he ever "personally directed sales or marketing

7    activities in or towards the State of California."  (*Id.* at ¶ 5.)

8           In the face of Mr. Friedlander's denials, Plaintiffs point to two discovery documents to

9    bolster their "direction and control" argument.  First, they cite to Ms. Daines's deposition

10   transcript, arguing it demonstrates that Mr. Friedlander "partnered" with the founder of the Basic

11   Research Enterprise and "directed and participated in creating the Products' brand strategy as part

12   of the marketing team."  (ECF No. 270-1 at 38.)  A closer inspection of the transcript, however,

13   reveals that it cannot carry as much water as Plaintiffs would hope.  While Ms. Daines does refer

14   to Mr. Friedlander as a partner and "part of the marketing team," she did not state that he had any

15   power over directing or implementing brand strategy.  (*See* Daines Dep., Ex. 6, 70:18–71:11.)  In

16   fact, Ms. Daines explicitly stated that Dennis Gay, the founder of Basic Research, was solely

17   responsible for making final marketing decisions.  (*Id.* 72:2–8.)  Second, Plaintiffs point to

18   multiple patents that list Mr. Friedlander, along with Dr. Heaton and Dennis Gay, as an inventor

19   of the products at issue in this case.  (ECF No. 270-1 at 38 (citing Ex. 4).)  They fail, however, to

20   explain the jurisdictional relevance of this fact.  The Court agrees with Mr. Friedlander that the

21   existence of the patents alone does not permit the Court to pierce the corporate veil and attribute

22   the conduct of any Entity Defendant to Mr. Friedlander for personal jurisdiction purposes.

23          Plaintiffs also argue personal jurisdiction is proper under an alter ego theory.  The TAC

24   alleges Mr. Friedlander "organized a scheme to undercapitalize" SanMedica, Limitless, and

25   Novex.  (ECF No. 175 at ¶ 102(a).)  Evidence of this exists in the absence of corporate records

26   for these entities, which the holding companies maintain.  (*Id.* at ¶ 102(b).)  As an example of

27   failing to observe corporate formalities, the TAC alleges Mr. Friedlander helped to distribute the

28   products at issue in this case "with packaging that identified illusory undercapitalized

37

1   manufacturers." (*Id.* at ¶ 102(c).)  He also "participated" in a marketing scheme to make it appear

2   there was a "scientific consensus on the efficacy of the[] fake worthless Products." (*Id.* at ¶

3   102(d).)  None of these allegations, however, provides facts responsive to the "unitary interest"

4   factors under Utah or Delaware law.  (*See* ECF No. 217 at 16.)  Rather, they are recitations of the

5   bad acts that Plaintiffs allege against the Defendants throughout the complaint, but with Mr.

6   Friedlander's name attached to them.  At most, Plaintiffs have demonstrated that Mr. Friedlander

7   had an unspecified ownership interest in all the Entity Defendants for about a year of the alleged

8   class period in this case.  The fact that Plaintiffs list conclusory allegations — most of which they

9   allege, almost verbatim, against the other Individual Defendants — under Mr. Friedlander's name

10  instead of lumping those allegations together with those against the other Defendants does not

11  cure the Court's prior concern that Plaintiffs "essentially allege[] that everyone did everything in

12  a conclusory manner, without any supporting factual allegations." *Pizana*, 2022 WL 1241098, at

13  *14.  The Court agrees with Mr. Friedlander that this mere change in formatting is insufficient to

14  establish alter ego jurisdiction.  (*See* ECF No. 266 at 4.)

15              c.      *The Court cannot exercise personal jurisdiction over Gina*

16                      *Daines*

17          According to the TAC, Ms. Daines is the sister of Bodee Gay, Ms. Blackett, and Ms.

18  Haws, and Chief Marketing Officer of the Basic Research Enterprise.  (ECF No. 175 at ¶¶ 64–

19  65.)  She is "personally responsible for the design, content, approval, [and] distribution of all

20  product advertisements, including the specific advertisements viewed and relied upon by

21  Plaintiffs." (*Id.* at ¶ 65.)  She holds herself out as a marketing executive and spokesperson for

22  BR, SanMedica, Limitless, and Novex and "makes the final decision on both the content of

23  advertising and . . . on product pricing." (*Id.*)  She became an owner of the Basic Research

24  Enterprise in 2018.  (*Id.* at ¶ 46.)  Ms. Daines's declaration paints a slightly more complex

25  picture.  From 1994 to 2015, she worked as Vice President of Marketing at various entities

26  associated with Basic Research.  (Daines Decl., at ¶ 3.)  She worked as Chief Marketing Officer

27  from only 2018 to 2019.  (*Id.* at ¶ 6.)  Since 2019, she has worked as both a consultant and

28  marketing assistant.  (*Id.* at ¶¶ 7–8.)  Ms. Daines denies any involvement in the decision-making

1   process surrounding the formation, capitalization, ownership, asset control, or maintenance of

2   corporate records for any Entity Defendant.  (*Id.* at ¶ 9.)

3          Plaintiffs contend Ms. Daines's declaration "does nothing to refute" the allegations in the

4   TAC, which claim that she "at all relevant times" worked as Chief Marketing Officer of all Entity

5   Defendants.  (ECF No. 270-1 at 38.)  Unless Plaintiffs contend the only relevant time period in

6   this litigation is 2018 to 2019, however, their claim misreads Ms. Daines's declaration.

7   Moreover, Plaintiffs point to no part of the TAC or evidentiary record indicating that Ms. Daines

8   had final approval over any marketing decisions at any time.  The mere fact that she held the title

9   of Chief Marketing Officer for a brief period does not delineate what her actual function was or

10  her place within the Basic Research hierarchy.  Her flat denial of decision-making authority

11  requires Plaintiffs to proffer some evidence in opposition, and they have failed to do so.  They

12  have, therefore, failed to make a prima facie case that Ms. Daines was a "guiding light" or

13  "central figure" in operations of the Entity Defendants that would subject her to personal

14  jurisdiction in California.

15         As a basis for alter ego jurisdiction, the TAC presents allegations against Ms. Daines

16  identical to those it levies against Mr. Friedlander.  In their opposition, Plaintiffs point to Ms.

17  Daines's employment along with her statement that she has "part ownership in an entity that's

18  affiliated and connected to Basic Research."  (*See* ECF No. 270-1 at 43 (citing Daines Dep.

19  61:16–18.)  Plaintiffs provide no clarity about the extent of Ms. Daines's ownership interest in the

20  Basic Research Enterprise.  Nor do they provide evidence to counter the assertions in Ms.

21  Daines's declaration that she has never been involved in the management or operational decisions

22  of the Entity Defendants.  In fact, Plaintiffs' opposition states that, at all times, Ms. Daines

23  reported to another executive officer — first, Dennis Gay, and then Bodee Gay after 2016.  (ECF

24  No. 270-1 at 43.)  As with Mr. Friedlander, Plaintiffs provide no non-conclusory allegations or

25  other evidence responsive to the "unity of interest" factors under Utah or Delaware law.  The

26  Court may not exercise personal jurisdiction over Ms. Daines under such circumstances.

27  ///

28  ///

1
2

                *d.*     *The Court cannot exercise personal jurisdiction over either Haley Blackett or Kimberly Haws*

3          The TAC alleges Ms. Blackett is the sister of Mr. Gay, Ms. Daines, and Ms. Haws.  (ECF

4    No. 175 at ¶ 77.)  She "has worked in marketing at Basic Research and Bydex Management for

5    18 years and is an owner of Basic Research."  (*Id.* at ¶ 78.)  In this position, she "formulates,

6    directs, controls, or participates in the acts and/or business practices alleged" in the TAC.  (*Id.*)

7    Specifically, she has worked as a "traffic manager," trafficking "all the different marketing

8    materials that needed to get completed and made sure they got to different vendors and were

9    reproduced or produced."  (*Id.*)  The allegations against Ms. Haws are less specific, claiming that

10   she works in the marketing department and "formulates, directs, controls, or participates" in

11   unspecified business practices.  (*Id.* at ¶ 84.)  Finally, the TAC alleges, as it does with the other

12   Individual Defendants, that both Ms. Blackett and Ms. Haws are owners of the Basic Research

13   Enterprise and have "final decision-making authority" over BR's marketing department.  (*Id.* at

14   ¶¶ 78, 84.)  Both Ms. Blackett and Ms. Haws filed declarations explicitly disclaiming

15   involvement in any decisions regarding the formation, capitalization, ownership structure,

16   insuring, asset control, trademark registration, product formulation, or record maintenance" for

17   the Basic Research Enterprise.  (Haws Decl. at ¶ 7; Blackett Decl. at ¶ 6.)  Ms. Blackett states that

18   she worked as a Marketing Coordinator for some of the Entity Defendants from 2001 to 2015 but

19   has not worked for any Entity Defendant since that time.  (Blackett Decl. at ¶¶ 3–5.)  Similarly,

20   Ms. Haws worked as a "media buyer" for some of the Entity Defendants from 1998 to 2018.

21   (Haws Decl. at ¶¶ 4–5.)  Since that time, she has not worked for the Basic Research Enterprise.

22   (*Id.*)  Neither Ms. Blackett nor Ms. Haws disclaim an ownership interest in the Basic Research

23   Enterprise in their declarations.

24         Plaintiffs attempt to use Ms. Daines's deposition transcript to paint Ms. Blackett and Ms.

25   Haws as high-ranking officials and owners with decision-making authority.  Their citation to the

26   deposition, however, belies their assertion.  Ms. Daines simply identified Ms. Blackett and Ms.

27   Haws as employees of the Basic Research Enterprise in response to the question, "Have any other

28   family members worked in any sort of executive position *or otherwise* for the Basic Research

enterprise in the past 10 years?"  (Daines Dep. 63:18–20 (emphasis added).)  This response does not link Ms. Blackett or Ms. Haws to either an ownership interest or executive role at any Entity Defendant.  (*See id.* 63:22–24 ("They've worked for companies that produce services for Basic Research, not necessarily in the executive positions.").)  Moreover, Plaintiffs themselves suggest that Ms. Blackett and Ms. Haws reported to other individuals at the Basic Research Enterprise, contrary to their assertion that Ms. Blackett and Ms. Haws exercised final decision-making authority.  (ECF No. 270-1 at 45–46.)  Plaintiffs' allegations paint Ms. Blackett and Ms. Haws as employees of the Basic Research Enterprise with an unspecified ownership interest.  The Court cannot discern any allegations or evidence demonstrating that either individual was a "guiding light" or "central figure" of the Basic Research Enterprise's operations.

Unsurprisingly, the alter ego allegations that Plaintiffs levy against Ms. Blackett and Ms. Haws are essentially verbatim copies of those they allege against Mr. Friedlander and Ms. Daines. Their conclusory nature is just as unconvincing here, and exercising personal jurisdiction based on them would be equally inappropriate.

## IV.   MOTION TO TRANSFER VENUE

### A.   Legal Standard

When a district court determines that a plaintiff has filed a case in the wrong district, it has the discretion to dismiss the matter or transfer it to any district where venue would be proper.  28 U.S.C. § 1406(a).  Even where venue is proper in the district where the plaintiff files, parties may still request to transfer the matter to another appropriate venue "[f]or the convenience of the parties and witnesses, in the interest of justice."  *Id.* § 1404(a).  When considering a motion to transfer under § 1404(a), courts consider, among other factors:

> (1) the location where the relevant agreements were negotiated and executed, (2) the state that is most familiar with the governing law, (3) the plaintiff's choice of forum, (4) the respective parties' contacts with the forum, (5) the contacts relating to the plaintiff's cause of action in the chosen forum, (6) the differences in the costs of litigation in the two forums, (7) the availability of compulsory process to compel attendance of unwilling non-party witnesses, and (8) the ease of access to sources of proof.

///

41

1   *Jones v. GNC Franchising, Inc.*, 211 F.3d 495, 498–99 (9th Cir. 2000).  Other public interest

2   factors include the relative degree of court congestion and the interest in having localized

3   controversies decided at home.  *See Atl. Marine Const. Co., Inc. v. U.S. Dist. Ct. for W. Dist. of*

4   *Texas*, 571 U.S. 49, 62 n.6 (2013).  The moving party bears the burden of demonstrating the

5   circumstances that justify transfer.  *See Commodity Futures Trading Comm'n v. Savage*, 611 F.2d

6   270, 279 (9th Cir. 1979); *Celtic Int'l, LLC v. J.B. Hunt Trans., Inc.*, 234 F. Supp. 3d 1034, 1042

7   (E.D. Cal. 2017).

8                       B.        Weighing the factors

9                              i.        *The state most familiar with the governing law*

10          "There is an appropriateness in having the trial of a diversity case in a forum that is at

11   home with the state law that must govern the case, rather than having a court in some other forum

12   untangle problems in conflict of laws, and in law foreign to itself." *Van Dusen v. Barrack*, 376

13   U.S. 612, 645 (1964).  "Nevertheless, courts in all states are fully capable of applying another

14   state's substantive law." *Davis v. Soc. Serv. Coordinators, Inc.*, No. 1:10-cv-02372-LJO-SKO,

15   2013 WL 4483067, at *9 (E.D. Cal. Aug. 19, 2013); *see also Shultz v. Hyatt Vacation Mktg.*

16   *Corp.*, No. 10-CV-04568-LHK, 2011 WL 768735, at *4 (N.D. Cal. Feb. 28, 2011).

17          Entity Defendants argue Plaintiff's RICO claim, a federal cause of action, now

18   predominates the case, rendering this factor neutral at best.  (ECF No. 220 at 24; ECF No. 231 at

19   29.)  This fact takes on extra salience here because, as the Court has held, Plaintiffs cannot pursue

20   their RICO claim at all in this jurisdiction.  Therefore, not only is the District of Utah equally

21   competent in applying federal law, but it is the only jurisdiction with the ability to apply that law

22   in this case.  Plaintiffs note that this Court is particularly well-suited to address the claims because

23   it has adjudicated them for the past several years.  (ECF No. 270-1 at 60.)  This is true to a

24   degree.  While this Court is new to the case, having inherited it from Judge Drozd, the assigned

25   Magistrate Judge has been involved with this case from its inception.  Crediting this degree of

26   institutional knowledge, however, ignores the fact that Plaintiffs have substantially expanded the

27   scope of the proceedings, adding fourteen Defendants and a federal cause of action.  As discussed

28   above, the success of many of Plaintiffs' new claims will hinge on the availability of alter ego

42

1  liability, which will turn on Utah and Delaware, rather than California, law.  Given the expansive

2  nature of Plaintiffs' new claims, and Plaintiffs' inability to address one of them in this district, the

3  Court finds that this factor weighs in favor of transfer.

4                          *ii.*     *Plaintiff's choice of forum*

5         Typically, courts give significant deference to a plaintiff's choice of forum.  *See Lou v.*

6  *Belzberg*, 834 F.2d 730, 739 (9th Cir. 1987).  When the plaintiff represents a class, however, the

7  degree of deference depends on the extent of the named plaintiff's own contacts with the forum,

8  including those contacts related to the cause of action.  *Id.*  This rule "serves as a guard against

9  the dangers of forum shopping, especially when a representative plaintiff does not reside within

10 the district.  *Hawkins v. Gerber Prods. Co.*, 924 F. Supp. 2d 1208, 1215 (S.D. Cal. 2013).  In

11 assessing the weight to accord a plaintiff's choice of forum in class actions, courts consider "(i)

12 whether plaintiff and class members reside in the district; (ii) whether plaintiff's claims arise

13 within the district; and (iii) whether plaintiff's claims are based on the state law of the chosen

14 district."[12]  *Martinez v. Knight Transp., Inc.*, No. 1:16-cv-01730-DAD-SKO, 2017 WL 2722015,

15 at *4 (E.D. Cal. Jun. 23, 2017).

16        Gay Defendants argue the Court should grant little deference to Plaintiffs' choice of forum

17 because they seek to represent a nationwide class and because the facts relevant to Plaintiffs'

18

19 [12]      Entity Defendants cite to *Catch Curve, Inc. v. Venali, Inc.*, No. CV 05-04820 DDP
   (AJWx), 2006 WL 4568799, at *2 (C.D. Cal. Feb. 27, 2006) for the proposition that "deference to
20 the plaintiff's choice of forum is diminished if the moving party establishes one or more of the
   following factors: (1) the operative facts have not occurred within the forum; (2) the forum has no
21 particular interest in the parties or subject matter; (3) the forum is not the primary residence of
   either the plaintiff or defendant; or (4) the subject matter of the litigation is not substantially
22 connected to the forum."  (ECF No. 231 at 30.)  These factors are relevant to the venue question,
   but only to the extent that "no single factor is dispositive" to a court's analysis.  *Ctr. For*
23 *Biological Diversity v. Kempthorne*, No. C 08-1339 CW, 2008 WL 4543043, at *2 (N.D. Cal.
   Oct. 10, 2008) (citing *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988)).  Indeed, the
24 factors that *Catch Curve* identifies echo those that the Supreme Court and Ninth Circuit have held
   are relevant to the general question of proper venue.  *See, e.g.*, *Jones*, 211 F.3d at 498–99.  If
25 other venue factors weigh toward transfer, the plaintiff's choice of forum may not carry the day.
   To cabin consideration of the *Catch Curve* factors within the discussion of the plaintiff's choice
26 of forum, however, bears the risk of according them disproportionate weight — it would compel
   courts to consider them within the narrow context of the plaintiff's choice of forum factor and
27 then again under the broader context of the venue analysis.

28

                                                 43

1    claims did not arise within California.  (ECF No. 231 at 30.)  Entity Defendants make much the

2    same argument, stating, "Other than Plaintiffs' alleged purchase of the Products in California, all

3    of the relevant events occurred in Utah."  (ECF No. 220 at 22.)  Because the products at issue

4    "were conceived, researched, developed, marketed, and distributed all in and from Utah,"

5    Plaintiffs' claims will "rise or fall based on activities in Utah."  (*Id.*)  Therefore, they argue, this

6    factor favors transfer to Utah.  (*Id.* at 22–23.)

7            Defendants misconstrue the venue analysis.  Just because other factors may weigh toward

8    transfer does not mean that this factor does as well.  Moreover, the fact that a Court should not

9    automatically grant significant deference to the plaintiff's choice of forum in a class action case

10   does not mean that such deference will never be proper.  *See, e.g.*, *Noriesta v. Konica Minolta*

11   *Bus. Sols. U.S.A., Inc.*, No. EDCF 18-331 PSG (KKx), 2019 WL 6482222, at *4 (C.D. Cal. Jul. 8,

12   2019) (according deference to plaintiff's choice of forum in class action where both plaintiff and

13   defendants had "significant contacts" with the forum); *Rafton v. Rydex Series Funds*, No. C 10-

14   1171 CRB, 2010 WL 2629579, at *2–*3 (N.D. Cal. Jun. 29, 2010) (same); *see also Martinez*,

15   2017 WL 2722015 at *4–*5 (according slight weight to plaintiff's choice of forum and citing

16   other cases doing the same).  In this case, the seven named Plaintiffs all reside within California

17   and three of the four causes of action are based on California state law.  Defendants seek to

18   downplay the significance of these state law claims, arguing that Plaintiffs' "RICO claims have

19   become the focus" of the TAC, and that Plaintiffs' purchases of the products at issue in California

20   is "at best incidental to whether the Entity Defendants are indeed engaged in the vast web of

21   falsehoods that the TAC concludes exists."  (ECF No. 261 at 8.)  Plaintiffs' purchases of the

22   products at issue are not, however, merely incidental — they constitute the actual injury on which

23   Plaintiffs base their standing to bring this case.  Additionally, as Plaintiffs have repeatedly

24   proclaimed in the briefing and as this Court has recognized, the number of sales that Defendants

25   have made in California is substantial.  Their claims in this case certainly arise from Defendants'

26   contacts with California.

27           Gay Defendants argue that Plaintiffs' citation to *Hendricks v. StarKist Co.*, No. 13-cv-729

28   YGR, 2014 WL 1245880, at *3 (N.D. Cal. Mar. 25, 2014), is factually distinguishable from this

1    case. (ECF No. 262 at 19.) There, the plaintiff of a putative class action seeking to represent

2    both a nationwide class and California subclass argued that transfer was inappropriate where the

3    court had not yet certified any class and there was no evidence the plaintiff had engaged in forum

4    shopping. *Id.* at *2–*3. The district court agreed that there was no evidence of forum shopping

5    and held that both the plaintiff's and defendant's significant contacts within the district weighed

6    against transfer. *Id.* at *3. Gay Defendants argue that, because the defendant admitted that it had

7    manufactured the products at issue in that case within the forum district, *Hendrick* has no

8    application to this case. (ECF No. 262 at 19 (citing *Hendricks*, 2014 WL 1245880, at *3).) This

9    is a distinction without a difference. There is no venue-related relevance to the fact that the

10    Defendants in the instant case distributed and sold their product in the forum state rather than

11    manufactured it there. Defendants cite no authority to the contrary.

12         After three motions to transfer venue during the life of this case, Plaintiffs have remained

13    adamant about their intent to litigate in their chosen forum. Three of Plaintiffs' claims are based

14    on California law; the named Plaintiffs are all at home in California; and the underlying facts

15    arise from Defendants' contacts with California. Accordingly, this factor weighs against transfer.

16               *iii.*    *The respective parties' contacts with the forum*

17         Plaintiffs are all California residents. The only contacts that Defendants, who outnumber

18    Plaintiffs by about two-to-one, have with California are those that form the basis of this litigation.

19    This lack of contacts is particularly stark given that the Court has determined it can exercise

20    personal jurisdiction over fewer than half the Defendants. While Plaintiffs may be able to amend

21    their complaint in a way that addresses this lack of personal jurisdiction, their ability to do so is

22    not guaranteed. In contrast to this uncertainty is the fact that there is no question that the District

23    of Utah would be able to exercise personal jurisdiction over all Defendants. Given this reality,

24    this factor weighs in favor of transfer.

25              *iv.*    *Contacts relating to Plaintiffs' cause of action in the chosen forum*

26         The Court addressed this factor in its prior order denying transfer of venue. *See Pizana*,

27    2020 WL 469336, at *7. As the Court recognized, many of the operative facts at issue in this

28    litigation originated in Utah. *Id.* Defendants manufactured the products there, distributed them

45

1    there, and made marketing and advertising decisions there.  Nevertheless, as this Court has

2    recognized, "the fact that a corporation makes decisions at its headquarters in another district

3    'does not negate the local impact of those decisions when they are implemented elsewhere.'"  *Id.*

4    (quoting *Shultz v. Hyatt Vacation Mktg. Corp.*, No. 10-CV-04568, 2011 WL 768735, at *5 (N.D.

5    Cal. Feb. 28, 2011)).  As already discussed, Plaintiffs have alleged that the implementation of

6    Defendants' decisions in California has been substantial.  Defendants have provided no reason to

7    accord this factor any more weight than the Court has previously given it.  Therefore, this factor

8    weighs slightly in favor of transfer.

9                        *v.      Differences in the costs of litigation in the two forums*

10           Defendants do not argue that a change in venue will alter the aggregate costs of litigating

11   this case.  (ECF No. 231 at 30.)  Their only argument regarding this factor is that it would obviate

12   the need to continue litigating the issue of personal jurisdiction.  (*Id.*)  Defendants provide no cost

13   estimate on how resolving this issue would impact the aggregate cost of litigation.  Moreover,

14   many of the personal jurisdiction issues deal with the availability of alter ego liability.  This will

15   remain an issue subject to discovery and litigation in this case regardless of its location.  Just as

16   the Court noted in its prior order regarding transfer of venue, Defendants have "failed to show

17   that transfer would eliminate, rather than shift, the inconvenience of costs."  *Pizana*, 2020 WL

18   469336, at *6.  This factor, therefore, weighs against transfer.

19                        *vi.     Convenience to witnesses and availability of compulsory process to*

20                        *compel attendance of unwilling non-party witnesses*

21           "[V]enue is primarily a matter of convenience of litigants and witnesses."  *Denver &*

22   *R.G.W.R. Co. v. Bhd. of R.R. Trainmen*, 387 U.S. 556, 560 (1967).  "To demonstrate

23   inconvenience to witnesses, the moving party should produce information regarding the identity

24   and location of the witnesses, the content of their testimony, and why such testimony is relevant

25   to the action."  *Williams v. WinCo Foods, LLC*, No. 2:12-cv-02690-KJM-EFB, 2013 WL 211246,

26   at *4 (E.D. Cal. Jan. 10, 2013).  Additionally, courts consider the availability of compulsory

27   process under Federal Rule of Civil Procedure 45 to hale unwilling witnesses into court.  *See*

28   *Jones*, 211 F.3d at 498–99.  Rule 45 permits courts to compel a person's attendance at a trial,

1    hearing, or deposition within 100 miles of where the person resides, is employed, or regularly

2    transacts business.  Fed. R. Civ. P. 45(c)(1)(A).  Similarly, courts can compel the attendance of

3    any party or party's officer at a trial, hearing, or deposition, anywhere within the state where that

4    party or party officer resides, is employed, or regularly transacts business.  *Id.* 45(c)(1)(B).

5    "[T]he convenience of third party witnesses is more important than that of party witnesses."  *In re*

6    *Ferrero Litig.*, 768 F. Supp. 2d 1074, 1080 (S.D. Cal. May 11, 2011).

7         Entity Defendants state that a "majority of the individuals who researched, created,

8    manufactured, marketed, and distributed the relevant products did so from Utah."  (ECF No. 220

9    at 23.)  Further, they allege that "[n]umerous third party witnesses located in Utah will provide

10   relevant testimony."  (*Id.*)  The Gay Defendants echo these assertions.  (ECF No. 231 at 31.)

11   Plaintiffs, on the other hand, assert that the only witnesses these Defendants have identified are

12   employees, not third parties.  (ECF No. 270-1 at 61.)  Plaintiffs also state that they "anticipate

13   taking the testimony of numerous lay-parties and third-parties," including "hundreds of

14   thousands, if not millions" of California residents, "numerous retailers," Plaintiff's expert, and

15   two doctors who authored and conducted the clinical study of SeroVital.  (*Id.* at 64.)

16        The Court agrees with Defendants that most of Plaintiffs' proffered third-party witnesses

17   are irrelevant to the Court's analysis.  Plaintiffs chide Defendants for failing to provide specific

18   witness information while at the same time, with no hint of irony, invoking the possible testimony

19   of "hundreds of thousands, if not millions" of Californians and "numerous retailers."  This type of

20   assertion — which lacks any degree of specificity — does not sway the Court.  Nor does any

21   argument about the convenience to Plaintiffs' expert.  *See Open Innovation, LLC v. Char-Broil*,

22   No. CV 10-8175-JFW (FMOx), 2011 WL 13217756, at *4 (C.D. Cal. Feb. 11, 2011).

23   Nevertheless, Plaintiffs specifically name two individuals based in California who prepared the

24   study of SeroVital on which Defendants rely when promoting the health benefits of the products

25   at issue in this case.  (ECF No. 270-1 at 64.)  Given the parties' dispute regarding the efficacy and

26   veracity of this study, the Court anticipates the testimony of these witnesses will be significant.

27        Defendants similarly overstate the degree to which they have identified ten third-party

28   witnesses who will be inconvenienced by venue in California.  (*See* ECF No. 220 at 10; Gay

47

1   Decl. at ¶ 17.)  Defendants name several former employees but fail to provide information about

2   the relevance of their testimony.  For example, they state that Steve Dickert and Jim Kreeck

3   reside in Utah and have information relating to sales and potential class members.  (ECF No. 220

4   at 10.)  Similarly, they claim that Stephanie Davis, Brian Robles, Jeff Wasden, and Leo

5   Trautwein have information about marketing and advertising.  (*Id.* at 10–11.)  The Court is left to

6   speculate as to why their testimony would be relevant, much less necessary, particularly when

7   there are individuals like Mr. Gay and Ms. Daines, who have already participated extensively in

8   the action and purportedly have knowledge about sales, marketing, and advertising.  Similarly,

9   Entity Defendants identify Keith Blauer, a "board certified infertility specialist" who has

10  recommended SeroVital to patients, as a potential third-party witness.  (*Id.* at 10.)  Again, the

11  relevance of Dr. Blauer's testimony is left to the imagination.  Defendants have failed to meet

12  their burden to demonstrate why any of these individuals would be necessary to this action, much

13  less inconvenienced by the case's current forum.

14          Defendants' invocation of Steve and Melyn Campbell is only relevant insofar as this

15  Court can exercise personal jurisdiction over Limitless.  Indeed, Entity Defendants claim that the

16  Campbells can attest to the "falsity of Plaintiffs' allegations that Mr. Bodee and his sisters, and

17  the Entity Defendants, own, operate and control Limitless, and the falsity of Plaintiffs' allegations

18  that Mr. Bodd [sic] and his sisters, and the Entity Defendants, are responsible for the

19  manufacture, marketing, advertising, distribution and sales of Limitless's products."  (*Id.* at 11.)

20  Given that Plaintiffs have not demonstrated the appropriateness of personal jurisdiction over

21  Limitless, the Campbell's proposed testimony is currently irrelevant.  Even if Plaintiffs had

22  alleged personal jurisdiction, the Court would still accord little weight to any inconvenience to the

23  Campbells.  As owners of Limitless, they are more akin to party witnesses than third-party

24  witnesses.  *See Skyriver Tech. Sols., LLC v. OCLC Online Comput. Library Ctr., Inc.*, No. C 10-

25  03305 JSW, 2010 WL 4366127, at *3 (N.D. Cal. Oct. 28, 2010).

26          The only proposed third-party witness that the Court finds relevant at this stage is Dr.

27  Heaton.  (*See* ECF No. 220 at 11.)  Throughout their briefing, the parties discuss the central role

28  that Dr. Heaton has played in the development and marketing of SeroVital.  The Court imagines

1    that her role in the litigation of this case will likely be significant.  Given the fact that Entity

2    Defendants assert that she is no longer an employee, the Court will consider her as a third-party

3    witness rather than an employee.  (*See id.* at 11.)

4        At this point, Plaintiffs have sufficiently posited two third-party witnesses and Defendants

5    have proffered one.  Nevertheless, given that Defendants outnumber Plaintiffs by about two-to-

6    one, the Court finds this factor to be neutral.

7                    *vii.*     *Ease of access to sources of proof*

8        "Ease of access to evidence is generally not a predominate concern in evaluating whether

9    to transfer venue because 'advances in technology have made it easy for documents to be

10   transferred to different locations.'"  *Byler v. Deluxe Corp.*, 222 F. Supp. 3d 885, 906 (S.D. Cal.

11   2016) (quoting *Metz v. U.S. Life Ins. Co. in City of N.Y.*, 674 F. Supp. 2d 1141, 1148 (C.D. Cal.

12   2009)).  The Court has addressed access to sources of proof in a previous motion to dismiss, and

13   Defendants have provided no information to shift the weight of this factor.  They invoke the fact

14   that Plaintiffs have added fifteen new Defendants and a RICO cause of action to the TAC, but this

15   is a non sequitur.  (*See* ECF No. 220 at 24; ECF No. 231 at 31; ECF No. 261 at 10.)  Defendants

16   do not explain why the information relevant to the newly added Defendants is any more difficult

17   to transport or convert to digital form than it was previously.  *See Pizana*, 2020 WL 469336, at

18   *5; *Van Slyke v. Cap. One Bank*, 503 F. Supp. 2d 1353, 1362 (N.D. Cal. 2007) ("Other than

19   describing where their records are located, defendants do not contend that transporting records, or

20   reducing them to electronic form, would cause them significant hardship.").  In its previous order,

21   the Court also noted that Plaintiffs' physical evidence is in California and that Defendants had

22   "not shown that transfer would eliminate, rather than shift, the inconvenience of costs."  *Pizana*,

23   2020 WL 469336, at *5.  Plaintiffs reassert the existence of California-based evidence.  (ECF No.

24   270-1 at 65.)  Defendants have provided this Court no reason to deviate from its prior ruling that

25   this factor weighs slightly against transfer.

26                 *viii.*    *Potential consolidation of cases*

27       Entity Defendants argue that transfer to Utah might trigger the transfer and consolidation

28   of a sister case currently pending in the District of New Jersey, *Deibler v. Basic Research, LLC*,

No. 1:19-cv-20155-NLH-MJS.  (ECF No. 220 at 24.)  In the time since Entity Defendants made this argument, the District of New Jersey has, in fact, transferred *Deibler* to the District of Utah. *See Deibler v. Basic Research, LLC*, No. 1:19-cv-20155-NLH-MJS, 2023 WL 6058866, at *1 (D.N.J. Sept. 18, 2023).  Even so, Entity Defendants have still failed to "explain how a change of venue would ensure consistent outcomes in two different cases involving different classes of consumers proceeding under different state laws on different sets of facts."  *Pizana*, 2020 WL 469336, *6.  Defendants have not introduced any novel reasoning to support their argument apart from the introduction of new Defendants into the action.  Their argument, therefore, remains entirely speculative.  The Court will accord it no weight in favor of transfer.

*ix.*     *Court congestion*

All the parties agree that this Court carries one of the highest caseloads in the country and that the District of Utah operates with substantially less congestion.  (ECF No. 220 at 25; ECF No. 231 at 31–32; ECF No. 270-1 at 68–69.)  The Court has previously acknowledged the "impending, acute, and judicial catastrophe that the Eastern District of California faces."  *Pizana*, 2020 WL 469336, at *7 n.8 (citation and internal quotation omitted).  "Nevertheless, 'administrative considerations such as docket congestion are given little weight in this circuit in assessing the propriety of a § 1404(a) transfer.'"  *Id.* (quoting *Rubio v. Monsanto Co.*, 181 F. Supp. 3d 746, 765 (C.D. Cal. 2016)).  Plaintiffs reiterate this Ninth Circuit rule, but Gay Defendants ask the Court to accord more weight to this factor, citing to *Baird v. OsteoStrong Franchising, LLC*, 2022 WL 1063130, at *3 (E.D. Cal. Apr. 8, 2022).  (ECF No. 231 at 31.)  In that case, the district judge ordered transfer after noting the significant disparity in docket congestion between the Eastern District of California and the Southern District of Texas.  *Baird*, 2022 WL 1063130, at *3.  In that case, however, the Court had already granted a separate transfer motion as to all but one of the plaintiffs.  *Id.* at *1.  Additionally, there was a case involving substantially similar facts and claims already underway in the transferee district, and the district court determined that consolidation there was feasible.  *Id.* at *2–*3.  These facts, combined with the congestion in the Eastern District of California, outweighed "the Plaintiff's choice of forum, familiarity of each forum with the applicable law, and local interest in the controversy."  *Id.* at *3.

50

1    With this background in mind, the Court does not find *Baird* particularly persuasive.

2    There is no ongoing case in the District of Utah, the Court has not previously transferred other

3    parties, and any consolidation with *Deibler* is purely speculative at this point.  While this factor

4    certainly weighs in favor of transfer, nothing in *Baird* convinces this Court to accord it

5    disproportionate weight.

6                   x.      *Interest in having localized controversies decided at home*

7    Entity Defendants argue Utah's interest in this matter is at least as strong as California's

8    because, "[i]f Plaintiffs win their case, the Entity Defendants will be essentially bankrupt; jobs in

9    Utah will be lost, and the lives of numerous Utahns will be disrupted."  (ECF No. 220 at 24–25.)

10   The thrust of this argument rings of forum shopping — *i.e.,* seeking to litigate in a forum that will

11   be more hostile to an outcome that might have a negative impact on Utah's economy.

12   Nevertheless, Utah certainly has an interest in regulating industries within its borders.  *See*

13   *Romoff v. Johnson & Johnson Consumer Inc.*, No. 22cv75-LL-WVG, 2022 WL 3905301, at *5–

14   *6 (S.D. Cal. Aug. 26, 2022).  Indeed, the allegations in this case paint a picture of widespread

15   fraud emanating nationally from Defendants' headquarters in Salt Lake City.  Gay Defendants

16   take up this argument, citing to *Romoff v. Johnson & Johnson Consumer Inc.*  There, a single

17   California plaintiff brought a putative class action alleging claims under "consumer protection

18   statutes in California, Illinois, Maryland, Hawaii, New York, Massachusetts, Missouri, Rhode

19   Island, Vermont, Washington, and Washington, D.C."  *Id.* at *1.  The breadth of the claims in

20   *Romoff* was greater than those in this case — which, apart from the RICO claim, revolve entirely

21   around California laws.  As Plaintiffs point out, California has an interest in adjudicating these

22   claims brought under its state law.  (ECF No. 270-1 at 69.)  Moreover, the named Plaintiffs here

23   are all California residents, and California has an interest in "ensuring efficacious remedies . . .

24   for its citizens."  *Van Slyke*, 503 F. Supp. 2d at 1365.  Given the interests both states have in this

25   case, the Court finds this factor to be neutral.  *Cf. Martinez*, 2017 WL 2722015, at *8 (finding

26   local interest factor neutral where defendants had headquarters in Arizona and made employment

27   decisions there, but California had interest in "resolving controversies pertaining to its state-

28   employment law, and in protecting the rights of any putative California class members").

1

#### xi.    Conclusion

2    This case presents a close call.  The Court finds, however, that the factors weigh in favor

3   of transfer.  The fact that this Court lacks jurisdiction over Plaintiffs' RICO claim — something

4   Plaintiffs cannot cure with an amended complaint — as well as more than half the Defendants

5   bolsters the case for transfer.  Even though Mr. Friedlander did not argue for transfer, the Court

6   finds it appropriate to include him in the transfer rather than dismiss him from the action.  Title 28

7   U.S.C. § 1631 permits courts to transfer a case in order to cure jurisdictional defects.  "Transfer is

8   appropriate under § 1631 if three conditions are met: (1) the transferring court lacks jurisdiction;

9   (2) the transferee court could have exercised jurisdiction at the time the action was filed; and (3)

10   the transfer is in the interest of justice."  *Cruz-Aguilera v. I.N.S.*, 245 F.3d 1070, 1074 (9th Cir.

11   2001).  Transfer will typically "be in the interest of justice because normally dismissal of an

12   action that could be brought elsewhere is 'time consuming and justice-defeating.'"  *Miller v.*

13   *Hambrick*, 905 F.2d 259, 262 (9th Cir. 1990) (quoting *Goldlawr, Inc. v. Heiman*, 369 U.S. 463,

14   467 (1962)).  In this case, the Court has found it lacks jurisdiction over Mr. Friedlander and there

15   is no dispute among the parties that the District of Utah could have exercised jurisdiction at the

16   time Plaintiffs filed this action.  Finally, the Court finds that Plaintiffs have brought their claims

17   in good faith and that dismissal would prejudice them.  Therefore, the Court will join Mr.

18   Friedlander in the transfer to the District of Utah.

19    The Court acknowledges that the Defendants over which it can exercise personal

20   jurisdiction — SanMedica, Novex, CRM, BR, Bydex, and Mr. Gay — have all presented

21   arguments for dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6).  In the interest of

22   judicial economy, and to avoid the possibility of conflicting rulings, the Court will refrain from

23   addressing those arguments.  They will remain pending for resolution in the District of Utah.

24    **V.    CONCLUSION**

25    1.    SanMedica's motion to strike, (ECF No. 189), and motion to disqualify Plaintiffs'

26        counsel, (ECF No. 190), are DENIED;

27    2.    Mr. Friedlander's motion strike, (ECF No. 218), is DENIED;

28    3.    The Entity Defendants' motion to dismiss pursuant to Rule 12(b)(2) for lack of

personal jurisdiction (ECF No. 220) is GRANTED in part and DENIED in part as follows:

    a.    The motion to dismiss for lack of personal jurisdiction is GRANTED as to Count 1 — violation of the federal RICO Act — and as to Defendants BR Cos, BR Intermediate, BR Holdings, Sierra, and Majestic;

    b.    The motion to dismiss for lack of personal jurisdiction is DENIED as to Defendants BR and Bydex;

4. The Entity Defendants' motion to dismiss pursuant to Rule 12(b)(1) for lack of standing, Rule 12(b)(6) for failure to state a claim, and Rule 9(b) for failure to plead fraud with particularity, remains pending;

5. Limitless' motions for joinder in Entity Defendants' motion to dismiss for lack of personal jurisdiction, (ECF No. 234), and motion for judgment on the pleadings, (ECF No. 237), are GRANTED in part and DENIED in part as follows:

    a.    The motion for joinder in Entity Defendants' motion to dismiss for lack of personal jurisdiction is GRANTED;

    b.    The motion to dismiss under Rule 12(b)(2) for lack of personal jurisdiction is GRANTED;

    c.    The motion for judgment on the pleadings remains pending;

6. Mr. Friedlander's motion to dismiss, (ECF No. 217), is GRANTED in part and DENIED in part as follows:

    a.    Mr. Friedlander's motion to dismiss under Rule 12(b)(2) for lack of personal jurisdiction is GRANTED;

    b.    Mr. Friedlander's motion to dismiss under Rule 12(b)(6) remains pending;

7. The Gay Defendants' motion to dismiss, (ECF No. 231), is GRANTED in part and DENIED in part as follows:

    a.    The motion to dismiss under Rule 12(b)(2) for lack of personal jurisdiction is GRANTED as to Count 1 — violation of the federal RICO Act — and as to Defendants Gina Gaines, Haley Blackett, and Kimberly Haws;

b.      The motion to dismiss for lack of personal jurisdiction is DENIED as to

Defendant Bodee Gay;

c.      The motion to dismiss under Rules 9(b) and 12(b)(6) remains pending;

8.      In lieu of dismissal of certain counts and Defendants, and pursuant to the

Defendants' requests for transfer of venue, the Court will transfer this matter to the

District of Utah for all further proceedings;

9.      The Clerk of Court is directed to transfer this case to the United States District

Court for the District of Utah forthwith.

IT IS SO ORDERED.

Date:  December 7, 2023

Troy L. Nunley
United States District Judge